**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| METHODIST HEALTHCARE SYSTEM OF SAN ANTONIO, LTD., L.L.P. D/B/A METHODIST HOSPITAL NORTHEAST, D/B/A METHODIST HOSPITAL, AND D/B/A METHODIST HOSPITAL TEXSAN; KPH-CONSOLIDATION, INC. D/B/A HCA HOUSTON HEALTHCARE KINGWOOD AND D/B/A HCA HOUSTON HEALTHCARE NORTH CYPRESS; HOUSTON - PPH, LLC D/B/A HCA HOUSTON HEALTHCARE MEDICAL CENTER; COLUMBIA RIO GRANDE HEALTHCARE, L.P. D/B/A RIO GRANDE REGIONAL HOSPITAL; ORTHOPEDIC HOSPITAL, LTD. D/B/A TEXAS ORTHOPEDIC HOSPITAL; NORTH TEXAS - MCA, LLC D/B/A MEDICAL CITY ALLIANCE; COLUMBIA MEDICAL CENTER OF ARLINGTON SUBSIDIARY, L.P. D/B/A MEDICAL CITY ARLINGTON; COLUMBIA PLAZA MEDICAL CENTER OF FORT WORTH SUBSIDIARY, L.P. D/B/A MEDICAL CITY FORT WORTH; COLUMBIA HOSPITAL AT MEDICAL CITY OF DALLAS SUBSIDIARY, L.P. D/B/A MEDICAL CITY HEART & SPINE HOSPITALS, A CAMPUS OF MEDICAL CITY DALLAS; COLUMBIA MEDICAL CENTER OF PLANO SUBSIDIARY, L.P. D/B/A MEDICAL CITY PLANO; AND ST. DAVID'S HEALTHCARE PARTNERSHIP, L.P., LLP D/B/A ST. DAVID'S NORTH AUSTIN MEDICAL CENTER AND D/B/A ST. DAVID'S MEDICAL CENTER,<br><br>    Plaintiffs,<br><br>v.<br><br>BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA,<br><br>    Defendant. | CASE NO. |

**PLAINTIFFS' ORIGINAL COMPLAINT**                                          **PAGE 1**

## PLAINTIFFS' ORIGINAL COMPLAINT

COMES NOW Plaintiffs, Methodist Healthcare System Of San Antonio, Ltd., L.L.P. d/b/a Methodist Hospital Northeast, d/b/a  Methodist Hospital, and d/b/a Methodist Hospital Texsan; KPH-Consolidation, Inc. d/b/a HCA Houston Healthcare Kingwood and d/b/a HCA Houston Healthcare North Cypress; Houston - PPH, LLC d/b/a HCA Houston Healthcare Medical Center; Columbia Rio Grande Healthcare, L.P. d/b/a Rio Grande Regional Hospital; Orthopedic Hospital, Ltd. d/b/a Texas Orthopedic Hospital; North Texas - MCA, LLC d/b/a Medical City Alliance; Columbia Medical Center of Arlington Subsidiary, L.P. d/b/a Medical City Arlington; Columbia Plaza Medical Center of Fort Worth Subsidiary, L.P. d/b/a Medical City Fort Worth; Columbia Hospital at Medical City of Dallas Subsidiary, L.P. d/b/a Medical City Heart & Spine Hospitals, a Campus of Medical City Dallas; Columbia Medical Center of Plano Subsidiary, L.P. d/b/a Medical City Plano; and St. David's Healthcare Partnership, L.P., LLP d/b/a St. David's North Austin Medical Center and d/b/a St. David's Medical Center (collectively, "Plaintiffs" or "Hospitals"), by and through their attorneys of record, Polsinelli PC, and complain of Defendant, Blue Cross and Blue Shield of North Carolina (collectively, "Defendant" or "BCBS NC") as follows:

### STATEMENT OF FACTS

### A.    PARTIES

1.      Plaintiff Methodist Healthcare System of San Antonio, Ltd., L.L.P. d/b/a Methodist Hospital Northeast ("Methodist NE"), d/b/a Methodist Hospital ("Methodist"), and d/b/a Methodist Hospital Texsan ("Methodist Texsan") is a Texas limited partnership with its principal place of business in Bexar County, Texas. Methodist Healthcare System of San Antonio, Ltd., L.L.P. has six partners: Columbia/HCA Healthcare Corporation of Central Texas, a Texas corporation with its principal place of business in Davidson County, Tennessee; San Antonio

Regional Hospital, Inc., a Texas corporation with its principal place of business in Davidson County, Tennessee; W & C Hospital, Inc., a Texas corporation with its principal place of business in Davidson County, Tennessee; Village Oaks Medical Center, Inc., a Texas corporation with its principal place of business in Davidson County, Tennessee; MGH Medical, Inc., a Texas corporation with its principal place of business in Davidson County, Tennessee; and Methodist Healthcare Ministries of South Texas, Inc., a Texas corporation with its principal place of business in Bexar County, Texas. By and through its partners, Methodist Healthcare System of San Antonio, Ltd., L.L.P. is a citizen of Texas and Tennessee.

2.    Plaintiff KPH-Consolidation, Inc. d/b/a HCA Houston Healthcare Kingwood ("Kingwood") and d/b/a HCA Houston Healthcare North Cypress ("North Cypress") is a Texas corporation with its principal place of business in Harris County, Texas. KPH-Consolidation, Inc. is a citizen of Texas and Tennessee.

3.    Plaintiff Houston - PPH, LLC d/b/a HCA Houston Healthcare Medical Center ("HCA Houston MC") is a Texas limited liability company with its principal place of business in Harris County, Texas. Houston – PPH, LLC has one member: Houston Healthcare Holdings, Inc., a Delaware corporation with its principal place of business in Davidson County, Tennessee. By and through its member, Houston – PPH, LLC is a citizen of Delaware and Texas.

4.    Plaintiff Columbia Rio Grande Healthcare, L.P. d/b/a Rio Grande Regional Hospital ("Rio Grande") is a Delaware limited partnership with its principal place of business in Hidalgo County, Texas. Columbia Rio Grande Healthcare, L.P. has two partners: Rio Grande Regional Hospital, Inc., a Texas corporation with its principal place of business in Davidson County, Tennessee; and Columbia-SDH Holdings, Inc., a Delaware corporation with its principal

place of business in Davidson County, Tennessee. By and through its partners, Columbia Rio Grande Healthcare, L.P. is a citizen of Texas, Tennessee, and Delaware.

5.    Plaintiff Orthopedic Hospital, Ltd. d/b/a Texas Orthopedic Hospital ("TOH") is a Texas limited partnership with its principal place of business in Harris County, Texas. Orthopedic Hospital, Ltd. has two partners: Columbia Hospital Corporation at the Medical Center, a Texas corporation with its principal place of business in Davidson County, Tennessee; and Columbia/HCA of Houston, Inc., a Texas corporation with its principal place of business in Davidson County, Tennessee. By and through its partners, Orthopedic Hospital, Ltd. is a citizen of Texas and Tennessee.

6.    Plaintiff North Texas – MCA, LLC d/b/a Medical City Alliance ("MC Alliance") is a Texas limited liability company with its principal place of business in Tarrant County, Texas. North Texas – MCA, LLC has one member: Columbia-SDH Holdings, Inc., a Delaware corporation with its principal place of business in Davidson County, Tennessee. By and through its member, North Texas – MCA, LLC is a citizen of Texas, Delaware and Tennessee.

7.    Plaintiff Columbia Medical Center of Arlington Subsidiary, L.P. d/b/a Medical City Arlington ("MC Arlington") is a Texas limited partnership with its principal place of business in Tarrant County, Texas. Columbia Medical Center of Arlington Subsidiary, L.P. has two partners: Columbia North Texas Subsidiary GP, LLC, a Texas limited liability company with one member, Columbia North Texas Healthcare System, L.P.; and Columbia North Texas Healthcare System, L.P., a Texas limited partnership with one partner, North Texas General, L.P., a Texas limited partnership. North Texas General, L.P. has two partners: NTGP, LLC, a Texas limited liability company, and GalTex, LLC, a Texas limited liability company. Both NTGP, LLC and GalTex, LLC have one member: Columbia-SDH Holdings, Inc., a Delaware corporation with its principal

place of business in Davidson County, Tennessee. By and through its partners, Columbia Medical Center of Arlington Subsidiary, L.P. is a citizen of Texas, Delaware and Tennessee.

8.      Plaintiff Columbia Plaza Medical Center of Fort Worth Subsidiary, L.P. d/b/a Medical City Fort Worth ("MC Fort Worth") is a Texas limited partnership with its principal place of business in Tarrant County, Texas. Columbia Plaza Medical Center of Fort Worth Subsidiary, L.P. has two partners: Columbia North Texas Subsidiary GP, LLC, a Texas limited liability company with one member, Columbia North Texas Healthcare System, L.P.; and Columbia North Texas Healthcare System, L.P., a Texas limited partnership with one partner, North Texas General, L.P., a Texas limited partnership. North Texas General, L.P. has two partners: NTGP, LLC, a Texas limited liability company, and GalTex, LLC, a Texas limited liability company. Both NTGP, LLC and GalTex, LLC have one member: Columbia-SDH Holdings, Inc., a Delaware corporation with its principal place of business in Davidson County, Tennessee. By and through its partners, Columbia Plaza Medical Center of Fort Worth Subsidiary, L.P. is a citizen of Texas, Delaware and Tennessee.

9.      Plaintiff Columbia Hospital at Medical City of Dallas Subsidiary, L.P. d/b/a Medical City Heart & Spine Hospitals, a Campus of Medical City Dallas ("MC Heart & Spine") is a Texas limited partnership with its principal place of business in Dallas County, Texas. Columbia Hospital at Medical City of Dallas Subsidiary, L.P. has two partners: Columbia North Texas Subsidiary GP, LLC, a Texas limited liability company with its principal place of business in Davidson County, Tennessee; and Medical City Dallas Partner, LLC, a Delaware limited liability company with its principal place of business in Davidson County, Tennessee. Both limited liability companies are wholly owned by Columbia North Texas Healthcare System, L.P., a Texas limited partnership with its principal place of business in Davidson County, Tennessee. Columbia

North Texas Healthcare System, L.P. is wholly owned by Columbia-SDH Holdings, Inc., a Delaware corporation with its principal place of business in Davidson County, Tennessee. By and through its partners and parent entities, Columbia Hospital at Medical City of Dallas Subsidiary, L.P. is a citizen of the States of Texas, Tennessee and Delaware.

10.    Plaintiff Columbia Medical Center of Plano Subsidiary, L.P. d/b/a Medical City Plano ("MC Plano") is a Texas limited partnership with its principal place of business in Collin County, Texas. Columbia Medical Center of Plano Subsidiary, L.P. has two partners: Columbia North Texas Subsidiary GP, LLC, a Texas limited liability company with its principal place of business in Davidson County, Tennessee; and Medical Center of Plano Partner, LLC, a Delaware limited liability company with its principal place of business in Davidson County, Tennessee. Both limited liability companies are wholly owned by Columbia North Texas Healthcare System, L.P., a Texas limited partnership with its principal place of business in Davidson County, Tennessee. Columbia North Texas Healthcare System, L.P. is wholly owned by Columbia-SDH Holdings, Inc., a Delaware corporation with its principal place of business in Davidson County, Tennessee. By and through its partners and parent entities, Columbia Medical Center of Plano Subsidiary, L.P. is a citizen of Texas, Tennessee, and Delaware.

11.    Plaintiff St. David's Healthcare Partnership, L.P., LLP d/b/a St. David's North Austin Medical Center ("North Austin MC") and d/b/a St. David's Medical Center ("St. David's") is a Texas limited partnership with its principal place of business in Travis County, Tennessee. St. David's Healthcare Partnership, L.P., LLP has five partners: Round Rock Hospital, Inc., a Delaware corporation with its principal place of business in Davidson County, Tennessee; Columbia-SDH Holdings, Inc., a Delaware corporation with its principal place of business in Davidson County, Tennessee; COL-NAMC Holdings, Inc., a Texas corporation with its principal

place of business in Davidson County, Tennessee; St. David's Foundation, a Texas corporation with its principal place of business in Travis County, Texas; and Georgetown Healthcare System, Inc., a Texas corporation with its principal place of business in Williamson County, Texas. By and through its partners, St. David's Healthcare Partnership, L.P., LLP is a citizen of Texas, Tennessee, and Delaware.

12.    Defendant BCBS NC is a corporation organized under the laws of North Carolina doing business in Texas. BCBS NC is a citizen of North Carolina. BCBS NC does not maintain a regular place of business in Texas and does not have a designated agent for service of process in Texas. This lawsuit arises from BCBS NC's business in Texas, and it may therefore be served through the Texas Secretary of State pursuant to Tex. Civ. Prac. & Rem. Code § 17.044(b). BCBS NC's principal place of business is located at 4613 University Drive, Durham, North Carolina 27707, and BCBS NC can be served through its registered agent, CT Corporation System, at 160 Mine Lake Court, Suite 200, Raleigh, North Carolina 27615. BCBS NC is a licensee of the Blue Cross and Blue Shield Association ("BCBSA") and is licensed to offer Blue Cross and Blue Shield ("BCBS") branded health plans in the State of North Carolina. As explained below, BCBS NC's health insurance subscribers are not confined to the State of North Carolina, and routinely receive hospital services in other states, including Texas, for which BCBS NC is responsible.

### B.    JURISDICTION AND VENUE

13.    This Court has personal jurisdiction over BCBS NC because BCBS NC conducts substantial business in Texas, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred here. Further, as explained below, BCBS NC is an "Affiliate" of BCBSA and a "Payer" as defined in the Agreements (defined below). Specifically, the Agreements allow "Affiliates" of BCBSA and "Payers" access to the benefits of the Agreements (namely, in-

network reimbursement rates that are discounts from the Hospitals' billed charges), provided that the "Affiliates" and "Payers" comply with the terms and provisions of the Agreements. As such, by accessing the benefits of the Agreements, BCBS NC agreed to comply with their terms, including the requirement that the Agreements be governed by Texas law. Further, BCBS NC insures and/or administers health plans that cover Texas residents. Upon information and belief, each of the Subscribers (defined below) resides in the State of Texas. Each of the Subscribers received medical services in the State of Texas. BCBS NC issued and/or administered these health plans to/for Texas residents knowing of the possibility of having to resolve disputes under the Agreements based on Texas law. BCBS NC therefore has sufficient contacts with the State of Texas and does business in the State of Texas for purposes of personal jurisdiction, and it is reasonably foreseeable that BCBS NC would be haled into a Texas court for its actions in connection with insuring and/or administering health plans that cover Texas residents. Additionally, this Court has personal jurisdiction because the Employee Retirement Income Security Act of 1974 ("ERISA") provides for nationwide service of process, and BCBS NC has sufficient minimum contacts with the United States, as it does business in and is a citizen of the United States. *See* 29 U.S.C. § 1132(e)(2).

14.    This Court has subject-matter jurisdiction because this dispute is between citizens of different states (Plaintiffs are citizens of Texas, Tennessee, and Delaware, and BCBS NC is a citizen of North Carolina) and involves an amount in controversy greater than $75,000. This Court also has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs assert a claim under ERISA, 29 U.S.C. §§ 1001, *et seq.*, that arises under the laws of the United States. Further, this Court may exercise supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

15.     Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391(b)(2) because, as described below, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district. Specifically, the healthcare claims and appeals of such claims were provided to Blue Cross and Blue Shield of Texas ("BCBSTX") for initial processing and then subsequently forwarded by BCBSTX to BCBS NC, as described in additional detail below. BCBSTX is headquartered in the Northern District of Texas. As such, BCBSTX partially processed these claims and provided notices of their adjudication on behalf of BCBS NC in the Northern District of Texas, thus making venue proper under 28 U.S.C. § 1391(b)(2). Venue is also proper under 29 U.S.C. § 1132(e)(2) because Plaintiffs have asserted a claim under ERISA, and the administration of these health plans, for purposes of the claims at issue, took place at least in part by BCBSTX at its headquarters, which is located in the Northern District of Texas. Further, at least some portion of the breach of the health plans at issue took place in this judicial district, as BCBS NC denied reimbursement for medical services rendered in the Northern District of Texas.

### C.    FACTUAL BACKGROUND

### I.    THE AGREEMENTS AND THE BLUECARD PROGRAM

16.     Plaintiffs are acute care hospitals in Texas. Plaintiffs provide medically necessary services to their local communities.

17.     As part of their provision of medically necessary services to their local communities, Plaintiffs contracted with non-party BCBSTX through the following agreements:

  a.  Plaintiffs Methodist NE, Methodist, and Methodist Texsan contracted with BCBSTX under the Hospital Agreement for PPO/POS Network Participation (eff. Nov. 1, 2016, as amended) ("Methodist Agreement");

b.  Plaintiffs Kingwood, HCA Houston MC, North Cypress, Rio Grande, and TOH, by and through their disclosed agent, Gulf Coast Division, Inc., contracted with BCBSTX under the Hospital Agreement for PPO/POS Network Participation (eff. Nov. 1, 2016, as amended) ("Gulf Coast Agreement");

c.  Plaintiffs MC Alliance, MC Arlington, MC Fort Worth, MC Heart & Spine, and MC Plano, by and through their disclosed agent, North Texas Division, Inc., contracted with BCBSTX under the Hospital Agreement for PPO/POS Network Participation (eff. Nov. 1, 2016, as amended) ("North Texas Agreement"); and

d.  Plaintiffs North Austin MC and St. David's contracted with BCBSTX under the Hospital Agreement for PPO/POS Network Participation (eff. Nov. 1, 2016, as amended) ("St. David's Agreement," and collectively with the Methodist Agreement, Gulf Coast Agreement, and North Texas Agreement, the "Agreements").[1]

18.    The Agreements specify the terms and conditions under which Plaintiffs will treat patients with BCBS health plans, referred to in the Agreements and herein as "subscribers,"[2] and be reimbursed for that treatment. Under the Agreements, Plaintiffs are entitled to be paid specified rates for the provision of medically necessary services to a subscriber.

19.    The Agreements are far broader than the relationship between just Plaintiffs, BCBSTX, and subscribers enrolled in a BCBSTX health plan, however. The Agreements also

---

[1] The Agreements contain confidentiality provisions that prevent Plaintiffs from attaching them to this Complaint. The Agreements will be produced pursuant to a valid discovery request once a protective order has been entered.

[2] When used generally herein, the term "subscribers" is not capitalized. When the term is used to refer to the specific patients at issue in this dispute, the defined term "Subscribers" is used.

cover treatment that Plaintiffs provide through the "BlueCard Program" to any subscribers enrolled in any BCBS health plan, including subscribers who are insured by another state's BCBSA licensee. BCBS NC is the BCBSA licensee for the State of North Carolina, and when the patients at issue in this dispute who were insured by BCBS NC (the "Subscribers") received medical care at the Hospitals in Texas, the claims associated with such care were properly initially submitted to BCBSTX (the BCBSA licensee for the State of Texas) for processing in accordance with the terms of BCBSTX's contracts with the Hospitals, which are the Agreements. BCBS NC is bound by the Agreements in multiple ways: (a) by reason of its status as an "Affiliate" of BCBSA; (b) as a "Payer" under the Agreements; and (c) by its participation in the BlueCard Program, which is explained in more detail below.

20.     The Agreements provide that (a) Plaintiffs will provide services to subscribers of out-of-state BCBS plans through the BlueCard Program; (b) such out-of-state BCBS plans, as "Affiliates" of BCBSA and as "Payers" under the Agreements, will access the discounted rates set forth in the Agreements when Plaintiffs provide services to their subscribers through the BlueCard Program; and (c) the out-of-state BCBS plans, as "Affiliates" of BCBSA and as "Payers" under the Agreements, will be bound by the terms and obligations of the Agreements when Plaintiffs provide services to their subscribers through the BlueCard Program, which includes the obligation to pay claims in accordance with the Agreements.

21.     The Agreements specifically allow "Affiliates" of BCBSA and particularly, other BCBS plans through the BlueCard Program, access to the benefits of the Agreements (namely, in-network reimbursement rates), provided the "Affiliates" comply with all terms and provisions of the Agreements. Further, the Agreements specifically provide that Plaintiffs will provide covered

services to subscribers of "Affiliates," which includes BCBS NC, as set forth in and subject to the terms and conditions of the Agreements.

22. BCBS NC, by its conduct in processing the claims, communicating with Plaintiffs regarding such claims, issuing partial payment on some of the claims, and authorizing the care provided in some of the claims, did in fact access and rely upon the Agreements. As an "Affiliate" of BCBSA which has accessed and relied upon the Agreements, and acted as an assignee of the Agreements, BCBS NC is bound by the terms of the Agreements for the services at issue provided by Plaintiffs to the Subscribers.

23. BCBS NC, by participating in the BlueCard Program, also agreed to be a "Payer" under the Agreements.

24. The Agreements provide that BCBSTX and any "Payer," which includes entities that are financially responsible for the payment of services under a health plan administered by BCBSTX and with which BCBSTX directly or indirectly contracts, are bound by the Agreements, including their provisions concerning the payment of claims.

25. The definition of "Payer" in the Agreements includes participants in the BlueCard Program, like BCBS NC, because, under the BlueCard Program, BCBS NC is financially responsible for the claims submitted for services provided to its subscribers, and BCBS NC partially delegates its duties as health plan administrator to BCBSTX for the processing of BlueCard claims.[3]

26. Under the BlueCard Program, Plaintiffs submit their claims to BCBSTX (the "local" or "Host Plan") for the services they provided to a subscriber. BCBSTX then reviews the claim, determines the amount that would be payable under the Agreements for the services that Plaintiffs

---

[3] *See Health Care Serv. Corp. v. Methodist Hosps. of Dallas*, 814 F.3d 242, 246 (5th Cir. 2016) ("BCBSTX acts as the administrator for . . . claims arising under the BlueCard program.").

provided to the subscriber, and forwards the claim to the BCBS health plan that insures the subscriber or administers the subscriber's health plan (referred to as the "Home Plan"). The Home Plan then applies the subscriber's health benefits, makes coverage determinations, and either approves or denies payment for the services. BCBSTX then transmits the Home Plan's decision and payment to Plaintiffs. Importantly, the payment rates specified in the Agreements between BCBSTX and Plaintiffs govern the amount Plaintiffs are entitled to be reimbursed for the services provided to the subscriber, regardless of whether that subscriber is a participant in a BCBSTX health plan or another state's BCBS health plan. The Home Plan accesses and relies upon the rates specified in the Agreements when making payment.

27.    In the present case, BCBS NC is the Home Plan for the Subscribers. Plaintiffs rendered services to the Subscribers and submitted their claims for such services to BCBSTX for forwarding to BCBS NC through the BlueCard Program. Accordingly, and consistent with how the BlueCard Program operates, Plaintiffs expected BCBS NC to reimburse them for the services provided to its Subscribers at the rates specified in the Agreements.

28.    Plaintiffs' expectations of reimbursement by BCBS NC at the rates specified in the Agreements were reinforced by BCBS NC's own conduct and representations, which are consistent with, if not express admissions of, BCBS NC being bound by the Agreements as an "Affiliate" of BCBSA and the "Payer" of claims.

29.    BCBS NC, upon information and belief, represents on its website that the Hospitals are "in-network" with BCBS NC. Specifically, BCBS NC includes a page on its website where its subscribers with North Carolina health plans can locate care.[4] Upon information and belief, using

---

[4] *See Find Care*, Blue Cross NC (last visited Nov. 12, 2025), https://www.bluecrossnc.com/members/find-care. A printout of the webpage is attached hereto as <u>Exhibit 1</u>.

the "Find Care" tool on BCBS NC's website reveals that the Hospitals are "in-network" with BCBS NC for the Subscribers' health plans.[5]

30.     BCBS NC's website explains the difference between "in-network" and "out-of-network" as follows: "A health plan network is the group of health care providers and facilities a plan has a contract with. These are known as in-network providers. A provider that isn't included in the plan's contract is an out-of-network provider."[6]

31.     Further, in a provider manual published on BCBS NC's website (the "Provider Manual"), BCBS NC explains, "BlueCard is a national program that enables members of one (1) Blue Cross and/or Blue Shield (Blue Plan) to obtain health care service benefits while traveling or living in another Blue Plan's service area. The program links participating health care providers with the independent Blue Plans across the country and in many foreign countries and territories worldwide, through a single electronic network for claims processing and reimbursement."[7] BCBS NC further explains to its providers, "The BlueCard program lets you conveniently submit claims for members from other Blue Plans, including international Blue Plans, directly to Blue Cross NC. Blue Cross NC is your single point of contact for BlueCard claims payment, problem resolution and adjustments."[8]

---

[5] *See id.* Samples of the search results using BCBS NC's "Find Care" tool showing the Hospitals as "in-network" are attached hereto as Collective Exhibit 2.

[6] *See Shop Plans*, Blue Cross NC (last visited Nov. 12, 2025), https://www.bluecrossnc.com/shop-plans/health/network#:~:text=A%20health%20plan%20network%20is,out%2Dof%2Dnetwork%20provider.

[7] *See The Blue Book Provider E-Manual* – 2023, Blue Cross NC (last visited Nov. 12, 2025), https://www.bluecrossnc.com/content/dam/bcbsnc/pdf/providers/forms-documents/blue-books/2023-commercial-blue-book.pdf. Relevant excerpts from the Provider Manual are attached hereto as Exhibit 4.

[8] *See id.*

**PLAINTIFFS' ORIGINAL COMPLAINT**                                    **PAGE 14**

32.     The Provider Manual also includes illustrations of how the BlueCard Program operates, which demonstrate that the Home Plan must pay for the covered services provided to its subscriber at the rates specified in the Host Plan's contract with the provider.[9]

33.     Upon information and belief, the Host Plan and Home Plan have a direct or indirect contractual relationship relating to their participation in the BlueCard Program (*i.e.*, the Home Plan and Host Plan may directly contract with one another to participate in the BlueCard Program, or participation in the BlueCard Program may be a term of the licensing agreements between BCBSA and all BCBS licensees).[10]

34.     Through this network of contracts, the BlueCard program essentially operates as a rental network.

35.     Applying the mechanics of the BlueCard Program to the present dispute, the BlueCard Program should have operated as follows: BCBS NC is the Home Plan for the Subscribers. The Subscribers received care at the Hospitals in Texas. Plaintiffs submit their claims for reimbursement for the services they provided to the Subscribers to BCBSTX. Then, BCBSTX, acting as the administrator of the Subscribers' health plans, reviews the claims, determines the amount that would be payable under the Agreements based on the services Plaintiffs provided to the Subscribers, and forwards the claims to BCBS NC for adjudication. BCBS NC, as the Home Plan, applies the Subscribers' health benefits, makes coverage determinations, and approves or denies payment for the services, at the rates set forth in the Agreements. BCBSTX then transmits the Home Plan's decisions and payments to Plaintiffs.

---

[9] *See id.*; *see also In re: Blue Cross Blue Shield Antitrust Litigation* (MDL No. 2406), 308 F. Supp. 3d 1241, 1255 (N.D. Ala. 2018) ("Through the BlueCard program, the Plans have agreed that when a contracted provider treats a patient covered by a Home Plan . . . the Home Plan will reimburse the provider at a rate which equals (at a minimum) the levels received for providers under the provider's contract with its Host Plan.").

[10] *See id.* at 1254 ("Under BlueCard, Plans were required to make their local provider discounts available to all Blue Members, even if they lived in another Plan's service area.").

**PLAINTIFFS' ORIGINAL COMPLAINT**                                    **PAGE 15**

36.     Accordingly, and consistent with how the BlueCard Program operates, Plaintiffs expected BCBS NC to reimburse Plaintiffs for the services provided to its Subscribers at the rates specified in the Agreements, which are the rates BCBS NC agreed to pay, by virtue of participation in the BlueCard Program and as an "Affiliate" of BCBSA and "Payer" under the Agreements.

37.     Additionally, for at least some of the Subscribers at issue in this dispute, Plaintiffs received correspondence or communications directly from BCBS NC, as opposed to BCBSTX, concerning the claims at issue.

38.     BCBS NC's Subscribers received medical services from Plaintiffs through the BlueCard Program, and as an "Affiliate" of BCBSA and the "Payer" responsible for the claims associated with such care under the Agreements, BCBS NC is contractually bound by the Agreements, including their provisions obligating the "Payer" to timely and correctly pay claims at the rates set forth therein.

39.     Plaintiffs are authorized to assert the claims described herein on behalf of the Subscribers because upon admission to the Hospitals, each patient or their legal representative signs a form, often referred to as Conditions of Admission ("COA"), that includes an assignment of the patient's health insurance benefits (including an assignment of rights to pursue those benefits in litigation or in any other forms of dispute resolution in any forum for any type of relief) to Plaintiffs. The Subscribers signed these COA forms assigning their rights and benefits under their respective health plans to the Plaintiffs. These COA forms each contain the following provision or substantially similar language: "[p]atient assigns all his/her rights and benefits under existing polices of insurance providing coverage and payment for any and all expenses incurred as a result of services and treatment rendered by the Provider… I hereby irrevocably appoint the Provider as

my authorized representative to pursue any claims…. and/or legal remedies."[11] Further, each of the claims at issue was submitted with a "Y" in box 53 of the claim form, indicating that the claim was submitted pursuant to an assignment of benefits. At no point during the processing of any of the claims for reimbursement at issue in the present matter did BCBS NC deny any claims based upon or raise the existence of any anti-assignment language in the Subscribers' respective health plans.

## II.  Facts Concerning The Claims At Issue

40.    <u>Patient 1 – Procedure Performed in 2021</u>: At the time services were rendered, Patient 1 was a 63-year-old female with history of essential hypertension and known lower extremity thrombosis. Patient 1 was admitted to Methodist NE post operatively after an elective right iliac angiojet with thrombectomy. Patient 1 tolerated the procedure well, but while recovering in Methodist NE's post anesthesia care unit ("PACU"), Patient 1's providers noted that she was hypertensive with systolic blood pressure in the 200s and had abdominal pain and bloody stool. After a cardiology consult, Patient 1's providers started her on a heparin drip. Once she was medically stable, Patient 1 was discharged with instructions for outpatient follow up.

41.    Patient 1 presented to Methodist NE with insurance through BCBS NC. After Patient 1's admission, Methodist NE sent a request for authorization for the admission. When Methodist NE followed up with BCBS NC after Patient 1's discharge, however, a BCBS NC representative advised Methodist NE that the request was not received. On October 15, 2021, Methodist NE timely submitted a claim for the services provided to Patient 1 to BCBSTX for forwarding to BCBS NC. By correspondence dated November 16, 2021, BCBSTX, on behalf of

---

[11] Copies of the COA forms signed by the Subscribers, which have been redacted to protect the Subscribers' identities in accordance with The Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), are attached hereto as <u>Collective Exhibit 5</u>.

BCBS NC, denied the claim, stating "precertification/authorization/notification/pre-treatment absent."

42.     On or about November 22, 2021, Methodist NE timely submitted its first-level appeal to BCBSTX for forwarding to BCBS NC, enclosed a copy of Patient 1's medical records, and requested a medical necessity review. On December 13, 2021, Methodist NE contacted BCBSTX, and a BCBSTX representative stated that it received the appeal. Methodist NE followed up with BCBSTX two more times, and BCBSTX advised Methodist NE each time to allow additional time for review of the appeal. On January 21, 2022, Methodist NE contacted BCBSTX, and a BCBSTX representative informed Methodist NE that BCBS NC upheld the denial based on a purported lack of authorization.

43.     On or about February 3, 2022, Methodist NE timely submitted its second-level appeal to BCBSTX for forwarding to BCBS NC, enclosed a copy of Patient 1's medical records, and requested a medical necessity review. On February 24, 2022, Methodist NE spoke with a BCBSTX representative who confirmed receipt of the appeal. From March through May of 2022, Methodist NE contacted BCBSTX concerning the status of the appeal ten times, and each time a representative informed Methodist NE that additional time was needed for processing. On May 13, 2022, Methodist NE spoke with a BCBSTX representative who stated that BCBS NC upheld the denial based on a purported lack of authorization.

44.     The denial of Methodist NE's claim for services rendered to Patient 1 on the basis of purported lack of authorization constituted a wrongful denial of benefits and should be reversed.

45.     First, there is no indication that BCBS NC performed a medical necessity review on appeal, as provided for in the Methodist Agreement, despite Methodist NE's request for same. The services rendered to Patient 1 were medically necessary, as evidenced by Patient 1's medical

records. Under the Methodist Agreement, BCBS NC must pay for medically necessary, covered services, even if they were not authorized.

46.     Second, BCBS NC suffered no prejudice due to any alleged lack of authorization because Methodist NE rendered medically necessary care to BCBS NC's member, and BCBS NC has never challenged the appropriateness of the care provided to Patient 1.

47.     In sum, Methodist NE provided medically necessary, covered services to Patient 1 and is entitled to payment in full for those services. According to the terms of the Methodist Agreement, Methodist NE is entitled to be paid $55,843.96 for the medically necessary, covered services it provided to Patient 1.

48.     <u>Patient 2 – Procedures Performed in 2023</u>: At the time services were rendered, Patient 2 was a 58-year-old female with a history of uncontrolled type 2 diabetes and a chronic right medial lower leg diabetic ulcer that failed standard wound treatment who presented to Methodist to undergo scheduled outpatient wound evaluation and care. Her chronic non-healing diabetic ulcer was assessed for improvement and treated with the application of Kerecis Omega-3 Skin and Tissue substitute and dressing changes. Five wound intervention procedures were performed, and Patient 2 tolerated the procedures well. Methodist also provided Patient 2 education concerning optimization of her glucose levels and nutrition.

49.     Patient 2 presented to Methodist with insurance through BCBS NC. On December 6, 2023, Methodist timely submitted the claims for Patient 2's five outpatient procedures to BCBSTX for forwarding to BCBS NC. By correspondence dated December 12, 2023, BCBS NC made a partial payment on the first claim but made no further determination. After Methodist repeatedly contacted BCBSTX concerning the remaining claims, by correspondence dated February 26, 2024, BCBSTX, on behalf of BCBS NC: (1) paid a portion of the second claim but

denied the remaining portion of the claim on grounds that the "[p]rocedure/treatment/drug is deemed experimental/investigational by the payer;" (2) denied the third claim on grounds that the "[p]rocedure/treatment/drug is deemed experimental/investigational; and (3) paid a portion of the fourth claim but denied the remaining portion on grounds that "[t]hese are non-covered services because this is not deemed a 'medical necessity' by the payer." Then, by correspondence dated April 24, 2024, BCBSTX, on behalf of BCBS NC, paid a portion of the fifth claim but denied the remaining portion of the claim on grounds that "[t]hese are non-covered services because this is not deemed a 'medical necessity' by the payer."

50.     On or about March 7, 2024, Methodist timely submitted a first-level appeal to BCBSTX for forwarding to BCBS NC, enclosed a copy of Patient 2's medical records, and requested a medical necessity review. By correspondence dated April 24, 2024, BCBSTX, on behalf of BCBS NC, denied the appeal on the grounds that an authorization form signed by Patient 2 was required. An authorization letter signed by Patient 2 was not required, however, because Patient 2 signed a COA form upon admission, thereby assigning her appeal rights to Methodist, and Methodist also had appeal rights under the Methodist Agreement.

51.     On or about May 10, 2024, Methodist timely submitted a second-level appeal to BCBSTX for forwarding to BCBS NC, enclosed a copy of Patient 2's medical records, and requested a medical necessity review. On June 5, 2024, Methodist contacted BCBSTX concerning the appeal and was informed by a representative that the second-level appeal was not received. On the same day, Methodist resubmitted the second-level appeal to BCBSTX for forwarding to BCBS NC, once again enclosed a copy of Patient 2's medical records, and requested a medical necessity review. By correspondence dated July 8, 2024, BCBSTX informed Methodist that BCBS NC upheld the denial but did not state the basis for same.

52.    The denial of Methodist's claims for services rendered to Patient 2 for a purported lack of medical necessity and/or as experimental or investigational constituted a wrongful denial of benefits and should be reversed.

53.    Specifically, the services provided to Patient 2 were medically necessary and not experimental/investigational, as evidenced by Patient 2's medical records. Under the Methodist Agreement, BCBS NC must pay for medically necessary, covered services.

54.    In sum, Methodist provided medically necessary, covered services to Patient 2 and is entitled to payment for those services. According to the terms of the Methodist Agreement, Methodist is entitled to be paid $41,015.72 for the medically necessary, covered services it provided to Patient 2.

55.    <u>Patient 3 – Procedure Performed in 2024</u>: At the time services were rendered, Patient 3 was a 51-year-old female with a past history of lumbar spine stenosis with associated radiculopathy and a prior lumbar spine surgery in November 2023. Patient 3 subsequently developed a fracture of her hardware and worsening radicular pain. Accordingly, Patient 3 presented to Methodist Texsan's Emergency Department. At Methodist Texsan, Patient 3 underwent imaging, which showed Patient 3 suffered from: (1) displacement of the internal fixation device at the vertebrae; (2) breakdown of the internal fixation device; and (3) pathological fracture. Patient 3 was admitted as an inpatient per physician order and underwent a comprehensive staged spinal revision. Patient 3's procedure was complicated by obesity which made exposure difficult, and the peritoneum was found to have adhered to previous pelvic scar tissue. As a result, Patient 3 underwent a second procedure for a revision anterior discectomy and fusion with insertion of titanium disc spacers and bone morphogenetic proteins in the fusion bed. Patient 3 was discharged after six days of inpatient admission.

56.     Patient 3 presented to Methodist Texsan with insurance through BCBS NC. Methodist Texsan requested and obtained authorization for Patient 3's inpatient admission.

57.     On March 30, 2024, Methodist Texsan timely submitted the claim for the services provided to Patient 3 to BCBSTX for forwarding to BCBS NC. On April 3, 2024, additional charges were added to Patient 3's claim, and the claim was resubmitted to BCBSTX for forwarding to BCBS NC. On May 7, 2024, Methodist Texsan spoke with a BCBSTX representative who stated the claim was in review. On May 17, 2024, Methodist Texsan received correspondence from BCBSTX, on behalf of BCBS NC, requesting Patient 3's medical records. By correspondence dated May 24, 2024, BCBS NC denied Patient 3's claim in its entirety for allegedly "[i]ncomplete/invalid progress notes/report."

58.     On June 3, 2024, and again on June 6, 2024, Methodist Texsan mailed Patient 3's medical records to BCBSTX for forwarding to BCBS NC. On June 28, 2024, Methodist Texsan spoke with a BCBSTX representative who stated that while the medical records were received, they were allegedly insufficient. On July 3, 2024, Methodist Texsan resubmitted the claim to BCBSTX for forwarding to BCBS NC. By correspondence dated July 11, 2024, BCBS NC denied Patient 3's claim in its entirety for allegedly "[i]ncomplete/invalid progress notes/report."

59.     On or about August 8, 2024, Methodist Texsan timely submitted its first-level appeal to BCBSTX for forwarding to BCBS NC, enclosed a copy of Patient 3's medical records, and requested a medical necessity review. On September 26, 2024, Methodist Texsan spoke with a BCBSTX representative and informed BCBSTX that all requested documentation was included in the medical records. By correspondence dated 28, 2024, BCBSTX stated once again the medical records were insufficient and that BCBS NC needed the itemized bill, implant logs, and the admission and discharge summaries for Patient 3.

60.    By letter dated October 7, 2024, BCBSTX, on behalf of BCBS NC, again requested additional medical records. On November 6, 2024, Methodist Texsan once again submitted Patient 3's medical records. On November 8, 2024, Methodist Texsan spoke with a BCBSTX representative who stated that it received all necessary documentation. BCBSTX, on behalf of BCBS NC, confirmed receipt of the medical records by correspondence dated December 3, 2024. By correspondence dated December 13, 2024, BCBS NC denied the claim for a purported lack of medical necessity.

61.    On or about January 2, 2025, Methodist Texsan timely submitted its second-level appeal to BCBSTX for forwarding to BCBS NC, enclosed a copy of Patient 3's medical records, and requested a medical necessity review. On February 24, 2025, Methodist Texsan spoke with a BCBSTX representative who stated that BCBS NC upheld the appeal for a purported lack of medical necessity.

62.    The denial of Methodist Texsan's claim for the services provided to Patient 3 based on a purported lack of medical necessity constituted a wrongful denied of benefits and should be reversed.

63.    First, BCBS NC authorized the services provided to Patient 3. BCBS NC is prohibited from denying payment for Methodist Texsan's medically necessary services under these circumstances. *See* Tex. Ins. Code Section 1301.135(f). Further, under the Methodist Agreement, authorized services must be paid unless there is a finding of material misrepresentation or the hospital failed to perform the services, neither of which is applicable here.

64.    Second, the services rendered were medically necessary as evidenced by Patient 3's medical records and BCBS NC's prior authorization of such services. Under the Methodist Agreement, BCBS NC must pay for medically necessary, covered services.

65.     In sum, Methodist Texsan provided medically necessary, covered services to Patient 3 and is entitled to payment in full for those services. According to the Methodist Agreement, Methodist Texsan is entitled to be paid $124,804.67 for the medically necessary, covered services provided to Patient 3.

66.     <u>Patient 4 – Admitted and Discharged in 2023</u>: At the time services were rendered, Patient 4 was a 32-year-old male who presented to Kingwood's emergency department by emergency medical services ("EMS") after a suicide attempt by wrist laceration. Patient 4 experienced an estimated blood loss of 1,500 cc and required tourniquet placement due to arterial bleeding. He was intubated in Kingwood's emergency department, where he became hypotensive and required emergent transfusion of two units of packed red blood cells. He was noted to have a deep laceration to his left wrist involving tendons with an arterial bleed and a laceration to his left index finger. He was admitted as inpatient per physician order and underwent an emergent exploration and ligation of his ulnar artery and vein. He tolerated the procedure well and was transferred to the intensive care unit ("ICU") for continued management and treatment. Due to his suicide attempt, Patient 4 was placed on a court ordered involuntary psychiatric hold. He was extubated on the second day of his admission and continued to progress. A hand surgery consultation noted that Patient 4 would require further surgical intervention once stable to complete repair of the injury to his wrist. Psychiatry evaluated Patient 4 following extubation and recommended admission to an inpatient behavioral health facility upon discharge.

67.     While in the hospital, Patient 4 required a one-to-one sitter for constant supervision to prevent self-harm throughout his admission. After five days in the hospital, he was cleared by psychiatry for discharge to home, but due to the extent of his wrist injuries, he required further surgical repair. On the same day, he underwent a complete repair of his wrist injuries. The hand

surgeon cleaned and examined the wound, removed old stitches, freed the nerves from scar tissue, repaired the damaged tendons, and closed the wound. The entirety of the repair could not be completed in one day, and the remaining portion of the procedure was completed the next day without complication. After six days of inpatient admission, Patient 4 was discharged home in stable condition.

68.    Patient 4 initially presented through Kingwood's emergency department as uninsured. It was not until the third day of Patient 4's admission that Kingwood learned he had coverage under a BCBS NC health plan, and Kingwood provided notice to BCBS NC of Patient 4's admission that same day and submitted clinicals. BCBS NC denied authorization for the services provided to Patient 4 based on a purported lack of medical necessity. Throughout Patient 4's admission, Kingwood timely provided Patient 4's updated medical records to BCBS NC. By correspondence dated August 11, 2023, BCBS NC approved all dates of service for Patient 4's inpatient admission.

69.    On August 26, 2023, Kingwood timely submitted a claim for the medically necessary services provided to Patient 4 to BCBSTX for forwarding to BCBS NC, with the authorization number included on the claim form. By correspondence dated August 28, 2023, BCBSTX requested Kingwood submit an itemized bill to complete its review of the claim. On September 8, 2023, Kingwood provided Patient 4's medical records along with an itemized bill to BCBSTX for forwarding to BCBS NC. On September 25, 2023, BCBS NC denied the claim because an itemized bill had allegedly not been provided. On October 2, 2023, BCBSTX notified Kingwood that BCBS NC denied the claim because Patient 4's medical records had allegedly not been provided.

70.     On October 5, 2023, Kingwood spoke with a representative of BCBSTX, who confirmed receipt of Patient 4's medical records on September 8, 2023, and the representative stated that the medical records had been filed under a different claim number. On the same day, the BCBSTX representative also clarified that there was a request pending for Kingwood to provide an operative report with an implant tissue log. By correspondence dated October 5, 2023, BCBSTX, on behalf of BCBS NC, denied the claim in full for purportedly "incomplete/invalid progress notes/report."

71.     On or about October 9, 2023, Kingwood submitted its first-level appeal to BCBSTX for forwarding to BCBS NC, enclosed a copy of Patient 4's medical records, and requested a medical necessity review. On November 13, 2023, Kingwood checked the status of the appeal in Availity, which showed that the denial was upheld as of November 9, 2023.

72.     Meanwhile, on or about October 12, 2023, Kingwood timely re-billed the claim for services provided to Patient 4 and corrected the code that described the level of emergency care provided.   On October 30, 2023, Kingwood spoke with a representative of BCBSTX who confirmed receipt of the first-level appeal as of October 17, 2023. By correspondence dated November 10, 2023, BCBSTX informed Kingwood that BCBS NC denied the re-billed claim for allegedly "incomplete/invalid progress notes/report."

73.     On or about November 15, 2023, Kingwood timely submitted its second-level appeal to BCBSTX for forwarding to BCBS NC, enclosed a copy of Patient 4's medical records, and requested a medical necessity review. On December 7, 2023, Kingwood contacted BCBSTX, and a representative of BCBSTX confirmed receipt of the second-level appeal as of November 22, 2023, and stated that the appeal had been forwarded to BCBS NC for review on December 7, 2023. From December 14, 2023, to December 28, 2023, Kingwood contacted BCBSTX concerning the

status of the appeal three times, and each time, a representative informed Kingwood that additional time was needed for processing. On January 4, 2024, Kingwood was informed by a representative of BCBSTX that the claim had been processed correctly and that BCBS NC had upheld the denial on the basis that requested information was not provided to process the claim. By correspondence dated February 5, 2024, BCBSTX stated that BCBS NC required an operative report to process the claim for the services rendered to Patient 4. BCBSTX confirmed that Kingwood had submitted the operative report but claimed that it only received the first page.

74.     The denial of Kingwood's claim for the services rendered to Patient 4 for Kingwood's alleged failure to provide requested information constituted a wrongful denial of benefits and should be reversed.

75.     First, BCBS NC authorized Patient 4's entire inpatient admission. The services provided to Patient 4, as shown by the medical records submitted to BCBS NC on multiple occasions, were medically necessary. BCBS NC is prohibited by Texas law from denying payment for Kingwood's medically necessary services under these circumstances. *See* Tex. Ins. Code § 1301.135(f) ("If an insurer has preauthorized medical care or health care services, the insurer may not deny or reduce payment to the physician or health care provider for those services based on medical necessity or appropriateness of care."). Further, under the terms of the Gulf Coast Agreement, authorized services must be paid unless there is a finding of material misrepresentation or the hospital failed to perform the services, neither of which is applicable here.

76.     Second, there is no indication that BCBS NC performed a medical necessity review on appeal, as provided for in the Gulf Coast Agreement, despite Kingwood's request for the same. The services rendered were medically necessary, as evidenced by Patient 4's medical records provided to BCBS NC throughout Patient 4's admission, upon request from BCBS NC, and on

appeal. BCBS NC's failure to associate the requested and provided materials with the claim does not justify denial. Under the Gulf Coast Agreement, BCBS NC must pay for medically, necessary covered services.

77.     Further, at least some portion of the billed services constituted emergency and post-stabilization care services for which BCBS NC is required to pay under state and federal law. *See* 42 CFR § 438.114 and Tex. Ins. Code §1301.155.

78.     In sum, Kingwood provided medically necessary, covered services to Patient 4 and is entitled to payment in full for those services. According to the terms of the Gulf Coast Agreement, Kingwood is entitled to be paid $36,849.78 for the medically necessary, covered services it provided to Patient 4.

79.     <u>Patient 5 – Admitted and Discharged in 2023</u>: At the time services were rendered, Patient 5 was a 54-year-old male with a history of morbid obesity with associated comorbidities such as type 2 diabetes, obstructive sleep apnea, chronic venous insufficiency, and essential primary hypertension diabetes. During a pre-operative assessment, an upper endoscopy revealed that Patient 5 had a small hiatal hernia. Patient 5 presented to HCA Houston MC for planned inpatient procedures, including a laparoscopic Roux-en-Y gastric bypass, a laparoscopic hiatal hernia repair, and an umbilical hernia repair. Intraoperatively, the surgeon could not see the hiatal hernia on inspection and opted to forego the hiatal hernia repair. During the procedure, however, Patient 5's physician noted that his liver was enlarged with an irregular contour, necessitating a liver biopsy. Post-operatively, Patient 5 was admitted overnight to the PACU per physician order in stable condition. On the first post-operative day, Patient 5 was stable but required another night in the hospital to continue with intravenous ("IV") fluids and pain medications. Patient 5's wounds

appeared clean, dry, and intact, and Patient 5 was discharged home on the next day after two days of inpatient admission.

80.    Patient 5 presented to HCA Houston MC with insurance through BCBS NC. Prior to Patient 5's admission, BCBS NC authorized seven days of inpatient admission for Patient 5. On July 31, 2023, HCA Houston MC timely provided Patient 5's medical records and discharge summary to BCBS NC.

81.    On August 1, 2023, HCA Houston MC timely submitted its claim for the services provided to Patient 5 to BCBSTX for forwarding to BCBS NC, with the authorization number included on the claim. On August 22, 2023, HCA Houston MC checked the status of the claim in Availity, which revealed that the claim was in process. From August 29, 2023, to October 2, 2023, HCA Houston MC contacted BCBSTX concerning the claim's status five times, and each time, a BCBSTX representative informed HCA Houston MC that additional time was needed for processing. By correspondence dated October 5, 2023, HCA Houston MC was informed that BCBS NC denied the claim in full, alleging that the claim contained "incomplete and/or invalid information, and no appeal rights are afforded because the claim is unprocessable."

82.    On October 9, 2023, HCA Houston MC checked the status of the claim in Availity, which reflected that the claim was denied. On October 18, 2023, HCA Houston MC spoke with a representative of BCBSTX who stated that the claim was denied on the basis that the room and board charges did not match the dates of service billed and requested the claim be corrected. On October 23, 2023, HCA Houston MC re-billed the claim as a split claim, with the first claim being for Patient 5's pre-operative testing and the second for the planned inpatient procedures with the correct dates of service for the authorized dates of service.

83.     On October 30, 2023, BCBS NC issued payment for the pre-operative testing charges included in the first split bill. By correspondence dated November 7, 2023, BCBSTX requested the medical records for Patient 5's inpatient admission. On November 14, 2023, HCA Houston MC spoke with a representative of BCBSTX who stated that BCBS NC rejected the second split bill on November 3, 2023.

84.     The denial of HCA Houston MC's claim for services rendered to Patient 5 based on purportedly missing information constituted a wrongful denial of benefits and should be reversed.

85.     First, the services provided to Patient 5 were authorized and approved by BCBS NC. BCBS NC is prohibited from denying payment for HCA Houston MC's medically necessary services under these circumstances. *See* Tex. Ins. Code Section 1301.135(f) ("If an insurer has preauthorized medical care or health care services, the insurer may not deny or reduce payment to the physician or health care provider for those services based on medical necessity or appropriateness of care."). Further, under the Gulf Coast Agreement, BCBS NC must pay for authorized services, unless there is a finding of material misrepresentation or the hospital failed to perform the services, neither of which is applicable here.

86.     Second, the services provided to Patient 5 were medically necessary, as evidenced by Patient 5's medical records and supported by the fact that Patient 5's admission met InterQual criteria.[12] Additionally, Patient 5's inpatient admission is further corroborated by the fact that a laparoscopic Roux-en-Y gastric bypass is included on the CMS Inpatient Only list per Addendum

---

[12] InterQual criteria are guidelines used by health plans and healthcare providers as a tool to evaluate the appropriate level of care (inpatient, observation, or outpatient) for hospitalized patients. The guidelines are not determinative of medical necessity and are not a substitute for the professional medical judgment of a treating physician.

E.[13] Under the Gulf Coast Agreement, BCBS NC is required to pay for medically necessary, covered services.

87.     Third, BCBS NC failed to provide any explanation supporting its denial of the services provided to Patient 5. This violates federal law, which requires a health plan to provide "[t]he specific reason or reasons for the adverse determination" and "[i]f the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request." *See* 29 C.F.R. § 2560.503-1(g)(1)(i), (v)(B).) This similarly violates Texas law. *See* Tex. Ins. Code § 4201.303(a)(1)-(3) (requiring an adverse determination to include "the principal reasons for the adverse determination; the clinical basis for the adverse determination; [and] a description of or the source of the screening criteria used as guidelines in making the adverse determination").

88.     In sum, HCA Houston MC provided medically necessary, covered services to Patient 5 and is entitled to payment in full for those services. According to the terms of the Gulf Coast Agreement, HCA Houston MC is entitled to be paid $62,497.55 for the medically necessary, covered services it provided to Patient 5.

89.     Patient 6 – Admitted and Discharged in 2021: At the time services were rendered, Patient 6 was 53-year-old male with a history of chronic neck pain who had previously undergone evaluation for transient ischemic attack-like symptoms. Pre-operative testing showed a small focal

---

[13] The CMS Inpatient Only List is a list of medical procedures that the Centers for Medicare & Medicaid Services ("CMS") will only cover if they are performed in an inpatient hospital setting. The Inpatient Only List ensures that complex or high-risk procedures are performed in a safe and monitored environment and prevents these procedures from being performed in outpatient settings, such as surgery centers or doctor's offices where medically necessary support may not be available. While the Inpatient Only List is only applicable to claims made to CMS, it is often used as an industry-wide guide to assess which procedures are sufficiently complex such that they should only be performed on an inpatient basis.

ischemia area with otherwise normal cardiac studies. Patient 6 failed conservative management and reported worsening symptoms with physical therapy. An exam of Patient 6 showed reduced cervical motion, and imaging revealed multilevel cervical spondylosis with canal and foraminal stenosis. Patient 6's physician recommended that he undergo surgical intervention due to severe cervical radiculopathy. Patient 6 presented to North Cypress and underwent an anterior cervical discectomy with bilateral osteophytectomies and foraminotomies, along with placement of an anterior cervical disc replacement of C5-6 and C6-7.[14] Postoperatively, Patient 6 was admitted for observation, and he developed chest pain. Patient 6 underwent an electrocardiogram, which showed sinus tachycardia, but cardiac labs showed normal troponin. North Cypress's pulmonary team was consulted to assist with postoperative management. Patient 6's pain was controlled, and he remained compliant with use of his cervical collar and therapy recommendations. After one day of observation, Patient 6 was discharged home in stable condition.

90.    Patient 6 presented to North Cypress with insurance through BCBS NC. Prior to Patient 6's procedure, North Cypress reviewed the authorization requirements for the CPT codes associated with his procedure and observation level of care and determined that authorization was not required.

91.    On December 6, 2021, North Cypress timely submitted a claim for the services rendered to Patient 6 to BCBSTX for forwarding to BCBS NC. By correspondence dated December 8, 2021, BCBSTX stated that Patient 6's medical records were required to facilitate claim processing. North Cypress timely provided BCBSTX with Patient 6's medical records. By correspondence dated January 6, 2022, however, BCBSTX stated that it had not received medical records for Patient 6. North Cypress learned on January 10, 2022, that BCBS NC denied the claim

---

[14]  The CPT codes billed in connection with this procedure were 22856 and 22858.

on the basis of "missing patient medical record for this service." When North Cypress called BCBSTX on January 12, 2022, to inquire about receipt of the medical records, however, a BCBSTX representative stated that the claim had been rekeyed under a different claim number on January 4, 2022, and to allow additional time for the claim to be processed by BCBS NC. North Cypress timely provided Patient 6's medical records for a second time on January 20, 2022.

92.     During January of 2022 through April of 2022, BCBSTX, on behalf of BCBS NC, requested additional medical records for Patient 6 on six occasions. On March 14, 2022, a representative of BCBSTX informed North Cypress that BCBS NC had not received medical records to support CPT code J3490 (unclassified biologics), and when North Cypress provided the reference number for the medical records previously submitted, the representative stated that the reference was for a different claim number. As such, on March 16, 2022, North Cypress again submitted Patient 6's medical records to BCBSTX for forwarding to BCBS NC. By correspondence dated April 4, 2022, however, BCBSTX notified North Cypress that BCBS NC still required Patient 6's medical records to complete its review of the claim. Then, on April 16, 2022, BCBS NC denied the claim on the basis that the services billed were not documented in Patient 6's medical records.

93.     On April 22, 2022, North Cypress timely submitted a corrected claim for the services rendered to Patient 6. By correspondence dated May 12, 2022, BCBSTX notified North Cypress that BCBS NC denied the claim "as services not documented in patient's medical records."

94.     On or about May 19, 2022, North Cypress timely submitted a first-level appeal to BCBSTX for forwarding to BCBS NC, enclosed a copy of Patient 6's medical records, and

requested a medical necessity review. By correspondence dated June 2, 2022, BCBSTX, on behalf of BCBS NC, stated the claim disposition was based on the member's benefit coverage.

95.     On June 13, 2022, North Cypress spoke with a representative of BCBSTX who confirmed receipt of the first-level appeal as of May 27, 2022, and advised North Cypress to allow additional time for review.  On June 30, 2022, North Cypress contacted BCBSTX concerning the appeal and was again informed by a representative of BCBSTX to allow additional time for review. On July 7, 2022, North Cypress learned that BCBS NC upheld the denial as of June 2, 2022, purportedly based on the member's benefit coverage.

96.     On or about July 27, 2022, North Cypress timely submitted a second-level appeal to BCBSTX for forwarding to BCBS NC, enclosed a copy of Patient 6's medical records, and requested a medical necessity review. On August 21, 2022, a BCBSTX representative informed North Cypress that BCBSTX had not received the second-level appeal. On September 12, 2022, a BCBSTX representative again confirmed that BCBSTX had not received the appeal. On or about September 13, 2022, North Cypress re-submitted the second level appeal to BCBSTX for forwarding to BCBS NC, enclosed a copy of Patient 6's medical records, and requested a medical necessity review.

97.     On September 21, 2022, a BCBSTX representative confirmed receipt of the second-level appeal and advised North Cypress to allow additional time for review. On October 17, 2022, a BCBSTX representative informed North Cypress that on September 22, 2022, BCBS NC decided that the denial was not eligible for appeal but did not provide a reason as to why it was not eligible. On October 26, 2022, North Cypress spoke with a BCBSTX representative who confirmed the denial was not eligible for appeal because there was allegedly not enough information to support CPT code J3590 (unclassified biologics) on the claim.

**PLAINTIFFS' ORIGINAL COMPLAINT**                                      **PAGE 34**

98.     The denial of North Cypress' claim for services rendered to Patient 6 for a purported lack of information to support CPT code J3590 constituted a wrongful denial of benefits and should be reversed.

99.     First, the services rendered were medically necessary as evidenced by Patient 6's medical records and the fact that the procedure and observation level of care were ordered by Patient 6's physician in the exercise of their professional medical judgment. Further, BCBS NC failed to provide any explanation supporting its determination that the services provided to Patient 6 were not a covered benefit. This violates federal law, which requires a health plan to provide "[t]he specific reason or reasons for the adverse determination" and "[i]f the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request." *See* 29 C.F.R. § 2560.503-1(g)(1)(i), (v)(B).) This similarly violates Texas law. *See* Tex. Ins. Code § 4201.303(a)(1)-(3) (requiring an adverse determination to include "the principal reasons for the adverse determination; the clinical basis for the adverse determination; [and] a description of or the source of the screening criteria used as guidelines in making the adverse determination").

100.     In sum, North Cypress provided medically necessary, covered services to Patient 6 and is entitled to payment in full for those services. According to the Gulf Coast Agreement, North Cypress is entitled to be paid $57,240.74 for the medically necessary, covered services provided to Patient 6.

101.     <u>Patient 7 – Admitted and Discharged in 2023</u>: At the time services were rendered, Patient 7 was a 44-year-old female with a history of morbid obesity who presented to Rio Grande

for a scheduled procedure. Patient 7 underwent a robotic assisted Roux-en-Y gastric bypass surgery. Patient 7 tolerated the procedure well. Post-operatively, Patient 7 was admitted as an inpatient on the same day per physician order for post-operative management that included physical therapy/occupational therapy evaluation and treatment, diet assistance, bowel/bladder and activity/mobility support, and pain management. After one day of inpatient admission, Patient 7 was discharged home in stable condition with instructions for outpatient follow-up.

102.    Patient 7 presented to Rio Grande with coverage through BCBS NC. Prior to Patient 7's procedure, Rio Grande confirmed with Patient 7's treating physician that authorization had been approved.

103.    On April 14, 2023, Rio Grande timely submitted a claim for the services provided to Patient 7 to BCBSTX for forwarding to BCBS NC, with the authorization number included on the claim form. By correspondence dated May 10, 2023, BCBSTX, on behalf of BCBS NC, denied the claim in full, alleging "precertification/authorization/notification absent."

104.    On May 11, 2023, Rio Grande timely submitted an appeal to BCBSTX for forwarding to BCBS NC, enclosed a copy of Patient 7's medical records, and requested a medical necessity review. On June 1, 2023, Rio Grande checked the status of the appeal in Availity, which reflected receipt of the appeal as of May 22, 2023. On June 8, 2023, Rio Grande called BCBSTX, and a BCBSTX representative stated that the appeal was under review.

105.    The claim Rio Grande originally submitted for Patient 7 included outpatient testing services that Patient 7 underwent. On June 9, 2023, Rio Grande timely re-billed the claim for the services rendered to Patient 7 for only the procedure and post-operative admission to BCBSTX for forwarding to BCBS NC, with the authorization number included on the claim form. Between June 29, 2023, and July 21, 2023, Rio Grande followed up with BCBSTX representatives for the status

of appeal on four occasions and each time, BCBSTX representatives advised Rio Grande to allow additional time for review. By correspondence dated July 28, 2023, BCBS NC upheld the denial on appeal for a purported lack of precertification/authorization/notification.

106.    The denial of Rio Grande's claims for services rendered to Patient 7 for lack of authorization constituted a wrongful denial of benefits and should be reversed.

107.    First, Patient 7's procedure and admission were authorized by BCBS NC. BCBS NC is prohibited from denying payment for Rio Grande's medically necessary services under these circumstances. *See* Tex. Ins. Code Section 1301.135(f) ("If an insurer has preauthorized medical care or health care services, the insurer may not deny or reduce payment to the physician or health care provider for those services based on medical necessity or appropriateness of care."). Further, under the Gulf Coast Agreement, authorized services must be paid unless there is a finding of material misrepresentation or the hospital failed to perform the services, neither of which is applicable here.

108.    Second, there is no indication that BCBS NC performed a medical necessity review on appeal, as provided for in the Gulf Coast Agreement, despite Rio Grande's request for the same. The services rendered were medically necessary, as evidenced by Patient 7's medical records and supported by the fact that Patient 7's admission met InterQual criteria at the acute level of care. Additionally, Patient 7's procedure is listed on the CMS Addendum E Inpatient Only list, which further corroborates the medical necessity of Patient 7's inpatient admission.

109.    Finally, BCBS NC suffered no prejudice due to any alleged lack of authorization because Rio Grande rendered medically necessary care to BCBS NC's member, and BCBS NC has never challenged the appropriateness of the care provided to Patient 7, and in fact, authorized such services.

110.    In sum, Rio Grande provided medically necessary, covered services to Patient 7 and is entitled to payment in full for those services. According to the terms of the Gulf Coast Agreement, Rio Grande is entitled to be paid $35,925.85 for the medically necessary, covered services it provided to Patient 7.

111.    Patient 8, Admitted and Discharged in 2021: At the time the services were rendered, Patient 8 was a 64-year-old-male who presented to TOH with significant bilateral knee pain, stiffness, and restricted range of motion that affected Patient 8's activities of daily living and that failed to be resolved with conservative treatment. Patient 8 underwent x-rays, which revealed significant joint space narrowing with large osteophyte formation, subchondral sclerosis, periarticular cysts, malalignment, and varus deformity. Patient 8 presented to TOH for a scheduled right total knee replacement with use of computer-assisted navigation for diagnosis of right knee osteoarthritis. Patient 8 tolerated the procedure well. Post-operatively, Patient 8 was hemodynamically and medically monitored.

112.    Patient 8 pre-registered for his procedure with BCBS NC coverage and presented to TOH with insurance through BCBS NC.

113.    On December 1, 2021, TOH timely submitted a claim for the services provided to Patient 8 to BCBSTX for forwarding to BCBS NC. BCBSTX, on behalf of BCBS NC, remitted payment for the medical services rendered to Patient 8. By correspondence dated December 8, 2022, however, BCBSTX, on behalf of BCBS NC, informed TOH that an overpayment was made and requested that TOH refund the full amount paid. On April 6, 2023, BCBSTX recouped the payment, alleging that "[c]overage/program guidelines were not met."

114.    On or around April 10, 2023, TOH timely submitted its first-level appeal to BCBSTX for forwarding to BCBS NC, enclosed a copy of Patient 8's medical records, and

requested a medical necessity review. From May 8, 2023, to August 29, 2023, TOH contacted BCBSTX 13 times, and each time, a representative of BCBSTX informed TOH that the appeal was still under review or requested TOH to resubmit the appeal, which the hospital promptly did. On September 5, 2023, TOH contacted BCBSTX, and a representative informed TOH that BCBS NC upheld its denial of the claim.

115.    On or around September 9, 2023, TOH timely submitted its second-level appeal to BCBSTX for forwarding to BCBS NC, enclosed a copy of Patient 8's medical records, and requested a medical necessity review. On September 29, 2023, BCBSTX notified TOH that the appeal was sent to BCBS NC for review. On October 4, 2023, TOH contacted BCBSTX, and a representative informed TOH that BCBS NC upheld the denial due to a purported lack of authorization related to a specific CPT code, 20985, used in connection with the claim submitted for Patient 8.

116.    The denial of TOH's claim for services rendered to Patient 8 based on a purported lack of authorization constituted a wrongful denial of benefits and should be reversed.

117.    First, there is no indication that BCBS NC performed a medical necessity review on appeal, as provided for in the Gulf Coast Agreement, despite TOH's request for the same. Further, the services provided to Patient 8 were medically necessary, as evidenced by Patient 8's medical records and supported by that fact that the services provided to Patient 8 met Carelon Clinical Guidelines, which, upon information and belief, are used by BCBS NC to determine medical necessity.  Under the Gulf Coast Agreement, BCBS NC must pay for medically necessary, covered services.

118.    In sum, TOH provided medically necessary, covered services to Patient 8 and is entitled to payment in full for those services. According to the terms of the Gulf Coast Agreement,

TOH is entitled to $36,275.12 for the medically necessary, covered services it provided to Patient 8.

119.    <u>Patient 9, Procedure Performed in 2023</u>: At the time the services were rendered, Patient 9 was a 63-year-old female who presented to TOH with a long history of constant and severe knee pain, difficulty walking, severe osteoarthritis, osteophyte formation, and subchondral sclerosis that affected her activities of daily living and that had failed to be resolved with conservative treatment. Patient 9 presented to TOH for a total right knee arthroplasty. Patient 9 tolerated the procedure well and was discharged on the same day.

120.    Patient 9 pre-registered for her procedure with BCBS NC coverage and presented to TOH with insurance through BCBS NC.

121.    On or about May 11, 2023, TOH timely submitted an outpatient claim for Patient 9's procedure to BCBSTX for forwarding to BCBS NC. By correspondence dated June 2, 2023, BCBSTX fully denied the claim, stating that "[c]overage/program guidelines were not met." On June 9, 2023, BCBSTX clarified that the claim was denied due to lack of authorization.

122.    On or around June 14, 2023, TOH timely submitted its first-level appeal to BCBSTX, enclosed a copy of Patient 9's medical records, and requested a medical necessity review. On July 31, 2023, TOH contacted BCBSTX, and a BCBSTX representative notified TOH that the denial was upheld based on a purported lack of authorization.

123.    On or around August 1, 2023, TOH timely submitted its second-level appeal to BCBSTX, enclosed a copy of Patient 9's medical records, and requested a medical necessity review. On August 30, 2023, BCBSTX upheld the denial based on a purported lack of authorization. On September 6, 2023, TOH called BCBSTX, and a BCBSTX representative confirmed that BCBS NC upheld the denial.

124.    The denial of TOH's claim for services rendered to Patient 9 based on a purported lack of authorization constituted a wrongful denial of benefits and should be reversed.

125.    First, there is no indication that BCBS NC performed a medical necessity review on appeal, as provided for in the Gulf Coast Agreement, despite TOH's request for the same. Further, the services provided to Patient 9 were medically necessary, as evidenced by Patient 9's medical records. Under the Gulf Coast Agreement, BCBS NC must pay for medically necessary, covered services.

126.    In sum, TOH provided medically necessary, covered services to Patient 9 and is entitled to payment in full for those services. According to the terms of the Gulf Coast Agreement, TOH is entitled to $37,661.18 for the medically necessary, covered services it provided to Patient 9.

127.    <u>Patient No. 10 – Admitted and Discharged in 2021</u>: At the time services were rendered, Patient 10 was a 59-year-old female with a past medical history of lymphedema, diabetes, hypertension, hyperlipidemia, and morbid obesity. Patient 10 presented to MC Alliance's emergency department with progressively worsening bilateral lower extremity swelling, superficial wounds, nausea, generalized fatigue, and lightheadedness. During an exam in the emergency department, Patient 10's oxygen saturation dropped to 84%. Accordingly, Patient 10 was admitted as an inpatient per physician order for congestive heart failure with anasarca, acute respiratory failure with hypoxia, acute kidney injury, and bilateral lower extremity cellulitis.

128.    Patient 10 was treated with diuretics, fluid restriction, up to five liters of supplemental oxygen, and IV antibiotics. During her admission, Patient 10 was evaluated by MC Alliance's nephrology, pulmonology, infectious disease, and vascular surgery teams. Five days after her admission, Patient 10's was taken off antibiotics after her physician determined that she

did not have cellulitis. Nine days after her admission, Patient 10 transitioned to an oral diuretic, her swelling improved, and her renal function stabilized. Ten days after her admission, Patient 10 was discharged home.

129.    Patient 10 presented to MC Alliance with primary insurance coverage through Humana. MC Alliance first submitted Patient 10's clinicals to Humana by facsimile the day after she presented to MC Alliance. MC Alliance submitted Patient 10's clinicals to Humana multiple times throughout her admission. By correspondence dated November 2, 2021, Humana denied authorization for Patient 10's inpatient admission due to a purported lack of medical necessity.

130.    On or about November 14, 2021, MC Alliance timely submitted its claim for the medically necessary services provided to Patient 10 to Humana. On or about November 19, 2021, Humana denied the claim due to a lack of authorization.

131.    Meanwhile, MC Alliance learned that Patient 10 was also covered by a BCBS NC policy, and on December 21, 2021, MC Alliance timely submitted a claim for the medically necessary services provided to Patient 10 to BCBSTX for forwarding to BCBS NC. By correspondence dated January 27, 2022, BCBSTX, on behalf of BCBS NC, denied the claim in full, stating "[p]recertification/authorization/notification absent."

132.    Then, on or about February 3, 2022, Humana paid the claim. By correspondence dated April 8, 2022, however, Humana requested a refund, which MC Alliance learned was because BCBS NC was Patient 10's primary insurance, not Humana.

133.    On or about June 30, 2022, MC Alliance timely submitted an appeal to BCBSTX for forwarding to BCBS NC, enclosed a copy of Patient 10's medical records, and requested retroactive authorization. Between July 21, 2022, and August 16, 2022, TOH communicated on multiple occasions with BCBSTX by phone and through Availity, and BCBSTX consistently

indicated that the claim was under review and additional time for review was needed. On August 18, 2022, MC Alliance received correspondence from BCBSTX dated August 17, 2022, which stated that "[p]er the Home Plan, please be advised that Emergency Room services do not require prior authorization and would be payable if billed separately from Inpatient Admission."

134.    On or about August 19, 2022, MC Alliance submitted a corrected claim separating Patient 10's inpatient admission from the emergency services provided to her to BCBSTX for forwarding to BCBS NC. On August 26, 2022, MC Alliance spoke with a BCBSTX representative who stated that the corrected claim was received and in review. By correspondence dated September 19, 2022, BCBSTX, on behalf of BCBS NC, denied the corrected claim due to a lack of authorization. On or about September 23, 2022, MC Alliance received correspondence from BCBSTX, which stated that as of September 21, 2022, "[r]ecords have been sent to the home plan [BCBS NC] for review." MC Alliance received no further communications or decisions from BCBS NC.  MC Alliance received no payment.

135.    The denial of MC Alliance's claim for services rendered to Patient 10 on the basis of a purported lack of authorization constituted a wrongful denial of benefits and should be reversed.

136.    First, under the North Texas Agreement and federal law, MC Alliance is not required to obtain authorization for emergency and stabilization services. *See* 29 C.F.R. § 2590.715-2719A (eff. Sept. 13, 2021). Patient 10 presented through MC Alliance's emergency department while experiencing a medical emergency. MC Alliance was unable to notify or obtain authorization from BCBS NC prior to Patient 10's admission to MC Alliance because Patient 10 presented with Humana as her primary insurance.

137.     Second, there is no indication that BCBS NC performed a medical necessity review on appeal, as provided for in the North Texas Agreement, despite MC Alliance's request for the same. Further, the services rendered were medically necessary as evidenced by Patient 10's medical records. Under the North Texas Agreement, BCBS NC must pay for medically necessary, covered services even if they were not authorized.

138.     Third, at least some portion of the billed services constituted emergency and post-stabilization care services for which BCBS NC is required to pay under state and federal law. *See* 42 CFR § 438.114 and Tex. Ins. Code §1301.155.

139.     Finally, BCBS NC suffered no prejudice as a result of any alleged lack of authorization. MC Alliance rendered medically necessary care to Patient 10, and BCBS NC has never challenged the appropriateness of the care rendered to Patient 10.

140.     In sum, MC Alliance provided medically necessary, covered services to Patient 10 and is entitled to payment in full for those services. According to the terms of the North Texas Agreement, MC Alliance is entitled to be paid $98,371.44 for the medically necessary, covered services it provided to Patient 10.

141.     Patient No. 11 – Admitted and Discharged in 2021: At the time services were rendered, Patient 11 was a 28-year-old male with a past medical history of hospital admission at MC Arlington for acute respiratory failure secondary to pneumonia, sepsis, and pulmonary edema. During Patient 11's prior hospital admission, he was intubated and required mechanical intubation. Following Patient 11's discharge, he was admitted to inpatient rehabilitation at MC Arlington per physician order. During his inpatient rehabilitation admission, Patient 11 underwent physical and occupational therapy and received pain control and treatment for left lower extremity swelling, insomnia, and cellulitis. Once Patient 11's blood pressure was controlled, he could perform

activities of daily living while seated, and Patient 11's family members completed training pertaining to his care, Patient 11 was discharged home with home healthcare in place and with all necessary equipment and medications.

142.    Patient 11 presented at MC Arlington with insurance through BCBS NC prior to his hospital admission. During his hospital admission, Patient 11 lost his job and insurance coverage. Subsequently, Patient 11 obtained insurance coverage through The Consolidated Omnibus Budget Reconciliation Act ("COBRA"). On or about December 31, 2021, MC Arlington confirmed Patient 11 had insurance through BCBS NC covering his inpatient rehabilitation admission at MC Arlington.

143.    On June 8, 2022, MC Arlington timely submitted a claim for the services provided to Patient 11 to BCBSTX for forwarding to BCBS NC. By correspondence dated June 29, 2022, BCBSTX, on behalf of BCBS NC, denied the claim in full, stating "[p]recertification/authorization/notification absent."

144.    On or about July 27, 2022, MC Arlington timely submitted its first-level appeal to BCBSTX for forwarding to BCBS NC, enclosed a copy of Patient 11's medical records, and requested a medical necessity review. Between August 17, 2022, and September 13, 2022, MC Arlington spoke with a BCBSTX representative five times, and each time, BCBSTX stated the appeal was under review and that additional time was needed. On September 20, 2022, MC Arlington spoke with a BCBSTX representative who stated that the first-level appeal was received on August 5, 2022, and that BCBS NC upheld its denial on September 15, 2022, on grounds that the claim had been processed correctly.

145.    On or about October 10, 2022, MC Arlington timely submitted its second-level appeal to BCBSTX for forwarding to BCBS NC, enclosed a copy of Patient 11's medical records,

and requested a medical necessity review. Between October 31, 2022, and January 3, 2023, MC Arlington communicated on multiple occasions with BCBSTX by phone, and BCBSTX consistently stated that the claim was under review and additional time for review was needed. On January 9, 2023, MC Arlington spoke with a BCBSTX representative who stated that BCBS NC upheld the denial on December 27, 2022, on grounds that the claim was processed correctly.

146.    The denial of MC Arlington's claim for services rendered to Patient 11 on the basis of a purported lack of authorization constituted a wrongful denial of benefits and should be reversed.

147.    First, there is no indication that BCBS NC performed a medical necessity review on appeal, as provided for in the North Texas Agreement, despite MC Arlington's request for the same. Further, the services rendered were medically necessary as evidence by Patient 11's medical records. Under the North Texas Agreement, BCBS NC must pay for medically necessary, covered services even if they were not authorized.

148.    Second, BCBS NC has suffered no prejudice as a result of any alleged lack of authorization. MC Arlington rendered medically necessary care to Patient 11, and BCBS NC has never challenged the appropriateness of the care rendered to Patient 11.

149.    In sum, MC Arlington provided medically necessary, covered services to Patient 11 and is entitled to payment in full for those services. According to the terms of the North Texas Agreement, MC Arlington is entitled to be paid $30,894.00 for the medically necessary, covered services it provided to Patient 11.

150.    Patient 12, Admitted and Discharged in 2021: At the time the services were rendered, Patient 12 was a 52-year-old male who presented to MC Fort Worth with progressively severe pain in the back, hip, and groin. Patient 12 had undergone a spinal fusion procedure a few

months prior, and an MRI showed evidence of specific screws loosening as well as pseudoarthrosis between the L4 and L5 vertebrae. On the first day of his admission, Patient 12's screws and fusion hardware were surgically removed and an OsteoAmp allograft bone fusion onlay and transforaminal lumbar interbody fusion cage were implanted. Patient experienced left foot weakness in the extensor hallucis longus and with dorsiflexion. Per his physician's orders, Patient 12 was admitted as an inpatient. Patient's inpatient admission was initially complicated by uncontrolled pain. Patient 12 refused inpatient rehabilitation and home health physical therapy. After several days, Patient 12's pain was controlled, and he was discharged home with outpatient physical therapy in place at his request.

151.    Patient 12 presented to MC Fort Worth with insurance through BCBS NC. Prior to Patient 12's procedure, BCBS NC authorized the procedure without specifying a level of care. During Patient 12's inpatient admission, MC Fort Worth sent updated medical records for Patient 12 to BCBS NC. MC Fort Worth also submitted Patient 12's discharge summary to BCBS NC.

152.    On November 6, 2021, MC Fort Worth timely submitted a claim for the services provided to Patient 12 to BCBSTX for forwarding to BCBS NC. By subsequent correspondence, BCBSTX, on behalf of BCBS NC, requested medical records and itemized bills for Patient 12, which MC Forth Worth timely provided. By correspondence dated March 8, 2022, BCSBTX, on behalf of BCBS NC, denied the claim in full, stating that reimbursement for the OsteoAmp allograft bone fusion onlay was denied as experimental/investigational.

153.    On or around April 15, 2022, MC Fort Worth timely submitted its first-level appeal to BCBSTX for forwarding to BCBS NC, enclosed a copy of Patient 12's medical records, and requested a medical necessity review. By correspondence dated May 12, 2022, BCBSTX, on behalf of BCBS NC, upheld the denial of the claim.

154.    On or around May 24, 2022, MC Fort Worth timely submitted its second-level appeal to BCBSTX for forwarding to BCBS NC. MC Fort Worth did not receive a response to its second-level appeal.

155.    The denial of MC Fort Worth's claim for services rendered to Patient 12 on the basis that they were purportedly experimental/investigational constituted a wrongful denial of benefits and should be reversed.

156.    The services provided to Patient 12, as evidenced by Patient 12's medical records and supported by the fact that Patient 12's admission met InterQual criteria, were medically necessary and were not experimental/investigational. Under the North Texas Agreement, BCBS NC must pay for medically necessary, covered services.

157.    In sum, MC Fort Worth provided medically necessary, covered services to Patient 12 and is entitled to payment in full for those services. According to the terms of the North Texas Agreement, MC Fort Worth is entitled to $107,098.24 for the medically necessary, covered services it provided to Patient 12.

158.    Patient 13, Admitted and Discharged in 2024: At the time the services were rendered, Patient 13 was a 54-year-old female who presented to MC Heart & Spine with lumbar stenosis/spondylosis/spondylolisthesis with radiculopathy. Patient 13 underwent a two-part surgery for anterior lumbar interbody fusion and posterior lumbar interbody fusion. Patient 13 tolerated the procedure well and was admitted as an inpatient post-operatively per physician order. Patient 13's pain was controlled post-operatively, and she regained mobility. Once medically cleared, she was discharged home in stable condition the day after the procedure.

159.    Patient 13 presented to MC Heart & Spine with insurance through BCBS NC. BCBS NC authorized the medical services provided to Patient 13.

160.    On June 24, 2024, MC Heart & Spine timely submitted a claim to BCBSTX for forwarding to BCBS NC. Subsequent correspondence from BCBSTX and BCBS NC requested medical records and itemized bills, which MC Heart & Spine timely provided. By correspondence dated August 28, 2024, BCBS NC denied the claim based on a purported lack of medical necessity. BCBSTX, on behalf of BCBS NC, confirmed the denial by an explanation of benefits dated November 13, 2024.

161.    On or around September 10, 2024, MC Heart & Spine timely submitted its first-level appeal to BCBSTX for forwarding to BCBS NC, enclosed a copy of Patient 13's medical records, and requested a medical necessity review. From October 8, 2024, to October 28, 2024, MC Heart & Spine contacted BCBSTX concerning the status of the appeal four times, and each time a representative of BCBSTX informed MC Heart & Spine that the appeal was still under review, which BCBSTX also confirmed by correspondence dated October 30, 2024.

162.    By correspondence dated November 12, 2024, BCBSTX, on behalf of BCBS NC, reprocessed the claim in response to the first-level appeal and issued a partial payment, with the remaining amount denied for a purported lack of medical necessity. On December 4, 2024, a representative of BCBSTX informed MC Heart & Spine that if it wanted to appeal the denied portion of the claim, it would have to obtain a signed authorization from the patient. An authorization letter signed by Patient 13 was not required, however, because Patient 13 signed a COA form upon admission, thereby assigning her appeal rights to MC Heart & Spine, and MC Heart & Spine also had appeal rights under the North Texas Agreement.

163.    On or around December 10, 2024, MC Heart & Spine timely submitted its second-level appeal to BCBSTX for forwarding to BCBS NC, enclosed a copy of Patient 13's medical records, and requested a medical necessity review. On January 17, 2025, BCBSTX informed MC

Heart & Spine that BCBS NC upheld its denial for the reasons originally stated in its previous correspondence. On January 23, 2025, MC Heart & Spine contacted a representative of BCBSTX, and the representative confirmed that the denial was based on a purported lack of medical necessity.

164.    The denial of MC Heart & Spine's claim for services rendered to Patient 13 based on a purported lack of medical necessity constituted a wrongful denial of benefits and should be reversed.

165.    The services provided to Patient 13 were medically necessary, as evidenced by Patient 13's medical records and supported by that fact that the services provided to Patient 13 met InterQual criteria. Under the North Texas Agreement, BCBS NC must pay for medically necessary, covered services.

166.    In sum, MC Heart & Spine provided medically necessary, covered services to Patient 13 and is entitled to payment in full for those services. According to the terms of the North Texas Agreement, MC Heart & Spine is entitled to $86,517.00 for the medically necessary, covered services it provided to Patient 13.

167.    <u>Patient 14, Admitted and Discharged in 2022</u>: At the time the services were rendered, Patient 14 was a 60-year-old female who presented to MC Plano with significant lower back and leg pain with junctional breakdown at the L1-L2 vertebrae. Patient 14 underwent an extreme lateral interbody fusion and posterior spinal fusion with revision of hardware. Patient 14 tolerated the procedure well and worked postoperatively with physical therapy and occupational therapy. Her pain was adequately controlled with medication, but Patient 14 developed complications of mild tachycardia and low oxygen saturation, and she was admitted as an inpatient per her physician's order. During her inpatient admission, Patient 14 used spirometry 5-10 times

per hour and worked with respiratory therapy. Patient 14 also underwent diagnostic testing to rule out the possibility of pulmonary embolism or pneumonia. Patient 14's hypoxia and tachycardia improved after several days, and she was discharged home.

168.    Patient 14 presented to MC Plano with insurance through BCBS NC. BCBSTX authorized the medical services provided to Patient 14.

169.    On January 3, 2023, MC Plano timely submitted an outpatient claim for Patient 14's procedure to BCBSTX for forwarding to BCBS NC.  On February 1, 2023, MC Plano timely submitted an inpatient claim for the services provided to Patient 14 to BCBSTX for forwarding to BCBS NC. By correspondence dated Janaury 11, 2023, BCBSTX, on behalf of BCBS NC, denied the outpatient claim, stating "[c]harge exceeds fee schedule/maximum allowable or contracted/legislated fee arrangement." Subsequent correspondence from BCBSTX and BCBS NC requested medical records and itemized bills, which MC Plano timely provided.

170.    On February 2, 2023, MC Plano submitted a corrected inpatient claim to BCBSTX for forwarding to BCBS NC. On February 22, 2023, MC Plano submitted an outpatient claim for COVID-19 testing provided to Patient 14, which BCBS NC paid.

171.    On or around February 8, 2023, MC Plano timely submitted its first-level appeal to BCBSTX for forwarding to BCBS NC, enclosed a copy of Patient 14's medical records, and requested a medical necessity review. By correspondence dated February 28, 2023, BCBSTX denied the claim based on purported "[i]ncomplete/invalid progress notes/report."

172.    On or around March 10, 2023, MC Plano timely submitted its second-level appeal to BCBSTX for forwarding to BCBS NC, enclosed a copy of Patient 14's medical records, and requested a medical necessity review. BCBSTX, on behalf of BCBS NC, informed MC Plano that some of the codes used in connection with the claim submitted for Patient 14 were being

downgraded due to allegedly not being supported by Patient 14's medical records. On April 5, 2023, MC Plano still had not received a decision on the appeal and sent a legal demand letter concerning payment for the claim. On April 11, 2023, MC Plano learned through Availity that the claim was denied based on Patient 14's medical records allegedly not supporting the services provided. By correspondence dated April 12, 2023, BCBSTX sent a correspondence date April 12, 2023, informing MC Plano that BCBS NC had upheld the denial based on "[s]ervices not documented in patients' medical records."

173.    The denial of MC Plano's claim for services rendered to Patient 14 on the basis that they were purportedly not supported by Patient 14's medical records constituted a wrongful denial of benefits and should be reversed.

174.    First, there is no indication that BCBS NC performed a medical necessity review on appeal, as provided for in the North Texas Agreement, despite MC Plano's request for the same. Further, the services provided to Patient 14 were medically necessary, as evidenced by Patient 14's medical records and supported by that fact that the services provided to Patient 14 met InterQual criteria and that certain services performed in connection with Patient 14's procedure are listed on the CMS Inpatient Only List (Addendum E). Under the North Texas Agreement, BCBS NC must pay for medically necessary, covered services.

175.    In sum, MC Plano provided medically necessary, covered services to Patient 14 and is entitled to payment in full for those services. According to the terms of the North Texas Agreement, MC Plano is entitled to $186,798.75 for the medically necessary, covered services it provided to Patient 14.

176.    Patient 15, Admitted and Discharged in 2022: At the time the services were rendered, Patient 15 was a 37-year-old female who presented to North Austin MC for spinal

surgery due to increasing weakness in her bilateral lower extremities with spasticity and weakness on the left side. Patient 15 underwent MRI imaging, which revealed a previous cervical fusion with progressive spondylosis and disk herniation with cervical stenosis. Accordingly, Patient 15 underwent hardware removal, an anterior cervical discectomy fusion for cervical myelopathy, and placement of an intervertebral body, plate, screws, and allograft. Following the procedure, Patient 15 was admitted to the neurological medical/surgical unit for close monitoring and observation per physician order. Postoperatively, Patient 15 reported pain as a ten on a scale of one to ten. Once Patient 15's pain was controlled with oral pain medication and she was cleared by physical therapy and occupational therapy, she was discharged home.

177.    Patient 15 presented to North Austin MC with insurance through BCBS NC.

178.    On March 8, 2022, North Austin MC timely submitted a claim for the services provided to Patient 15 to BCBS NC. BCBSTX, on behalf of BCBS NC, subsequently requested medical records and itemized bills. North Austin MC timely provided the requested documents. By correspondence dated May 17, 2022, and June 6, 2022, BCBSTX, on behalf of BCBS NC, denied the claim based on purportedly "[i]ncomplete/invalid progress notes/report." By separate correspondence dated June 6, 2022, BCBSTX, on behalf of BCBS NC, denied the claim, based on "[s]ervices not documented in patients' medical records."

179.    On or around July 1, 2022, North Austin MC timely submitted its first-level appeal to BCBSTX for forwarding to BCBS NC, enclosed a copy of Patient 15's medical records, and requested a medical necessity review. By correspondence dated July 13, 2022, BCBSTX informed North Austin MC that BCBS NC upheld the denial of the claim on grounds that the services provided to Patient 15 were purportedly not documented in her medical records.

180.    On or around August 17, 2022, North Austin MC timely submitted its second-level of appeal to BCBSTX for forwarding to BCBS NC, enclosed a copy of Patient 15's medical records, and requested a medical necessity review. By correspondence dated September 29, 2022, BCBSTX, on behalf of BCBS NC, upheld the denial of the claim on grounds that the services provided to Patient 15 were purportedly not documented in her medical records.

181.    The denial of North Austin MC's claim for services rendered to Patient 15 on the basis that they were purportedly not supported by Patient 15's medical records constituted a wrongful denial of benefits and should be reversed.

182.    First, there is no indication that BCBS NC performed a medical necessity review on appeal, as provided for in the St. David's Agreement, despite North Austin MC's request for the same. Further, the services provided to Patient 15 were medically necessary, as evidenced by Patient 15's medical records and supported by that fact that the services provided to Patient 15 met InterQual criteria. Under the St. David's Agreement, BCBS NC must pay for medically necessary, covered services.

183.    In sum, North Austin MC provided medically necessary, covered services to Patient 15 and is entitled to payment in full for those services. According to the terms of the St. David's Agreement, North Austin MC is entitled to $40,297.26 for the medically necessary, covered services it provided to Patient 15.

184.    Patient 16, Admitted and Discharged in 2022: At the time the services were rendered, Patient 16 was a 60-year-old male who presented to St. David's emergency department with exertional chest pains. Patient 16 was admitted as an inpatient per physician order, and Patient 16 underwent a left heart catheterization, which revealed multivessel coronary artery disease. Patient 16 underwent successful placement of intra-aortic balloon pump, and following the

procedure, Patient 16 was admitted to the ICU to be evaluated for cardiothoracic surgery. On the second day of Patient 16's inpatient admission, he underwent coronary artery bypass grafts on five separate veins and arteries. Post-operatively, Patient 16 remained in the ICU and required continued invasive hemodynamic monitoring. Patient 16 developed fluid overload, requiring administration of IV Lasix. Patient 16 was evaluated by physical therapy and was transferred to a lower level of care due to improvement in his condition. After six days of inpatient admission, Patient 16 was discharged home in stable condition.

185.     Patient 16 presented to St. David's with insurance through BCBS NC. St. David's submitted Patient 16's notice of admission and medical records to BCBS NC. On October 27, 2022, St. David's contacted BCBS NC, and a representative of BCBS NC informed St. David's that no authorization was on file for Patient 16 and directed St. David's to submit its claim for the services provided to Patient 16.

186.     On November 2, 2022, St. David's timely submitted a claim for the services provided to Patient 16 to BCBSTX for forwarding to BCBS NC. By correspondence dated November 21, 2022, BCBSTX informed St. David's that BCBS NC denied the claim, stating "precertification/authorization/notification absent."

187.     On or around November 21, 2022, St. David's timely submitted its first-level appeal to BCBSTX for forwarding to BCBS NC, enclosed a copy of Patient 16's medical records, and requested a medical necessity review. From December 12, 2022, to January 9, 2023, St. David's contacted BCBSTX four times concerning the status of the appeal and was informed on three of the occasions that the appeal was pending and on one other occasion that the representative was unable to speak to St. David's about the appeal. On January 20, 2023, BCBSTX informed St. David's that BCBS NC upheld its denial for a purported lack of authorization.

188.    On around January 24, 2023, St. David's timely submitted its second-level appeal to BCBSTX for forwarding to BCBS NC, enclosed a copy of Patient 16's medical records, and requested a medical necessity review. On February 21, 2023, March 10, 2023, and March 17, 2023, St. David's contacted BCBSTX, and a BCBSTX representative informed St. David's that the appeal was under review. On March 31, 2023, a representative of BCBSTX informed St. David's that the appeal was under review by BCBS NC. On April 7, 2023, St. David's contacted BCBSTX, and a representative informed St. David's that BCBS NC upheld its denial on March 30, 2023, for a purported lack of authorization.

189.    The denial of St. David's claim for services rendered to Patient 16 based on a purported lack of authorization constituted a wrongful denial of benefits and should be reversed.

190.    First, under the St. David's Agreement and federal law, St. David's is not required to obtain authorization for emergency and stabilization services. *See* 29 C.F.R. § 2590.715-2719A (eff. Sept. 13, 2021). Patient 16 presented to St. David's emergency department while experiencing a medical emergency. Furthermore, St. David's notified BCBS NC of Patient 16's admission upon learning that he had insurance through BCBS NC and requested authorization but was directed to submit a claim instead.

191.    Second, there is no indication that BCBS NC performed a medical necessity review on appeal, as provided for in the St. David's Agreement, despite St. David's request for the same. Further, the services rendered were medically necessary as evidenced by Patient 16's medical records and supported by the fact that Patient 16's admission met InterQual criteria. Under the St. David's Agreement, BCBS NC must pay for medically necessary, covered services even if they were not authorized.

192.    Third, at least some portion of the billed services constituted emergency and post-stabilization care services for which BCBS NC is required to pay under state and federal law. *See* 42 CFR § 438.114 and Tex. Ins. Code §1301.155.

193.    Finally, BCBS NC suffered no prejudice as a result of any alleged lack of authorization. St. David's rendered medically necessary care to Patient 16, and BCBS NC has never challenged the appropriateness of the care rendered to Patient 16.

194.    In sum, St. David's provided medically necessary, covered services to Patient 16 and is entitled to payment in full for those services. According to the terms of the St. David's Agreement. St. David's is entitled to $109,956.61 for the medically necessary, covered services it provided to Patient 16.

### D.    CAUSES OF ACTION

### COUNT I – PETITION TO COMPEL ARBITRATION PURSUANT TO 9 U.S.C. § 4

195.    The foregoing paragraphs are incorporated by reference.

196.    The Agreements between and among Plaintiffs and BCBS NC are valid and enforceable.

197.    The Agreements contain valid and enforceable arbitration clauses.

198.    BCBS NC has not agreed to arbitrate pursuant to the arbitration clauses contained in the Agreements.

199.    BCBS NC is, however, bound to the terms of the Agreements (as stated herein), including the arbitration clauses, and BCBS NC should therefore be compelled to arbitrate pursuant to the Federal Arbitration Act. *See* 9 U.S.C. § 4.

### COUNT II – BREACH OF CONTRACT (AGREEMENTS)

200.    The foregoing paragraphs are incorporated by reference.

201.    As alleged above, Plaintiffs are parties to the Agreements, which provide the terms and conditions under which Plaintiffs will treat subscribers with BCBS health plans and be reimbursed for that treatment.

202.    Specifically, BCBS NC is bound by the Agreements for three reasons: (1) as an "Affiliate" of BCBSA under the Agreements; (2) as a "Payer" under the Agreements; and (3) by reason of its participation in the BlueCard Program, through which, upon information and belief, it enters into contracts with BCBSTX or the BCBSA, which should be construed as one contract with Plaintiffs' Agreements with BCBSTX.

203.    With respect to claims processed by BCBSTX for BCBS NC under the BlueCard Program, BCBS NC is both an "Affiliate" and a "Payer" under the Agreements. Accordingly, and as expressly provided in the Agreements, BCBS NC is bound by the terms of the Agreements, including their payment terms.

204.    The Agreements specifically allow "Affiliates" of BCBSA and particularly, other BCBS plans through the BlueCard Program, access to the benefits of the Agreements (namely, in-network reimbursement rates), provided the "Affiliates" comply with all terms and provisions of the Agreements. Further, the Agreements specifically provide that Plaintiffs will provide covered services to subscribers of "Affiliates," which includes BCBS NC, as set forth in and subject to the terms and conditions of the Agreements.

205.    BCBS NC, by its conduct in processing the claims, communicating with Plaintiffs regarding such claims, issuing partial payment on some of the claims, and authorizing the care provided in some of the claims, did in fact access and rely upon the Agreements. As an "Affiliate" of BCBSA which has accessed and relied upon the Agreements, and acted as an assignee of the

Agreements, BCBS NC is bound by the terms of the Agreements for the services at issue provided by Plaintiffs to the Subscribers.

206.    BCBS NC is also a "Payer" under the Agreements because, upon information and belief, BCBS NC and BCBSTX contract directly or indirectly with one another to participate in the BlueCard Program, and under the BlueCard Program, BCBS NC is financially responsible for claims for which BCBSTX serves as administrator. BCBS NC's acknowledgement of its financial responsibility for the claims is supported by correspondence, partial payments, and authorizations received from BCBS NC for the Subscribers, as well as by the fact that the Home Plan accounts, upon information and belief, for payments made for claims processed under the BlueCard Program as expenses on its federal taxes. BCBSTX serving as administrator for the health plans for claims processed through the BlueCard Program is evidenced by the fact that, upon information and belief, the Host Plans charge an administration fee to the Home Plans for BlueCard claims. Under the Agreements, "Payers" are bound by the terms of the Agreements, including their payment terms, to the same extent as BCBSTX.

207.    BCBS NC's intent to be bound by the terms of the Agreements is also demonstrated by the representations made by BCBS NC to its subscribers and to providers. Specifically, BCBS NC represents that the Hospitals are "in-network" with BCBS NC. Further, BCBS NC also represents in its Provider Manual that the Home Plan is responsible for adjudicating claims for services provided to subscribers based on the subscribers' benefits and the providers' agreements with the local BCBS plans.

208.    Additionally, upon information and belief, the BlueCard program operates by all individual state licensees of the BCBSA entering into contracts with one another and/or with the BCBSA that allow licensees, such as BCBS NC, nation-wide access to in-network reimbursement

rates of other BCBS health plans, such as BCBSTX, for the licensees' members who receive medical services while living or traveling outside of the geographic boundaries of the Home Plan that issues the policy. Upon information and belief, each licensee must make its in-network rates available to all other BCBS-branded plans. The Host Plan charges the Home Plan an access fee for access to the local rates and an administrative fee for processing claims. In effect, these nation-wide contracts provide a means by which individual licensees of the BCBSA, such as BCBSTX, assign their rights and locally negotiated payment rates under contracts with health care providers, such as Plaintiffs, to other licensees of the BCBSA, such as BCBS NC, thus allowing those licensees access to in-network rates, including the substantial discounts off of billed charges built into such rates, under those contracts. The assigning BCBSA licensee, which in this case is BCBSTX, then acts as the claims administrator and forwards the claims to the Home Plan, which in this case is BCBS NC, for final determination and payment, for which the Home Plan is also obligated.

209.    Under this arrangement, the BlueCard Program is essentially a rental network.

210.    Accordingly, Plaintiffs contract with BCBSTX, and, upon information and belief, BCBSTX contracts with BCBS NC (directly or indirectly through the BCBSA) to grant BCBS NC access to the negotiated rates and terms between Plaintiffs and BCBSTX as set forth in their Agreements.

211.    Under Texas law, when there are multiple contracts between multiple parties in the rental network context, courts have construed the agreements as one contract between the multiple parties.

212.    In this case, the Agreements between the Hospitals and BCBSTX and the agreements between BCBSTX and BCBS NC, whether direct or indirect through the BCBSA,

should be construed as one contract, such that BCBS NC is bound by the terms of BCBSTX's Agreements with the Hospitals.

213.    BCBS NC knew that by participating in the BlueCard Program with BCBSTX that it would be bound by the terms of BCBSTX's contracts with its local providers, like the Hospitals, which is evidenced by the Agreements' express references to "Affiliates" and "Payers" being bound by the terms of the Agreements.

214.    Accordingly, there was a meeting of the minds between Plaintiffs and BCBS NC as to the binding nature of the Agreements, as well as the material terms of the Agreements as they relate to both parties.

215.    Under the Agreements, Plaintiffs are entitled to be paid specified rates for the provision of medically necessary, covered services to a subscriber.

216.    Plaintiffs provided medically necessary, covered services to each of the Subscribers, and those services are payable under the terms of the Agreements.

217.    BCBS NC breached the Agreements by failing to pay in full for the medically necessary, covered services Plaintiffs provided to the Subscribers described above.

218.    Plaintiffs suffered damages as a direct and proximate result of BCBS NC's breach of the Agreements; specifically, Plaintiffs are entitled to be reimbursed in an amount not less than $1,148,047.87 under the Agreements for the medically necessary, covered services that Plaintiffs provided to BCBS NC's Subscribers.

## COUNT III – BREACH OF IMPLIED-IN-FACT CONTRACT

219.    The foregoing paragraphs are incorporated by reference.

220.    Alternatively, if BCBS NC is not bound by the terms of the Agreements as an "Affiliate" of BCBSA or as a "Payer," Plaintiffs are entitled to be reimbursed for the services

provided to the Subscribers pursuant to an implied-in-fact contract existing between Plaintiffs and BCBS NC by reason of BCBS NC's participation in the BlueCard Program.

221.    As participants in the BlueCard Program, Plaintiffs and BCBS NC impliedly agreed and understood that: (1) Plaintiffs would provide services to BCBS NC's subscribers, (2) Plaintiffs would submit claims to BCBSTX, BCBS NC's agent, for forwarding to BCBS NC for services provided to the subscribers, and (3) BCBS NC would reimburse Plaintiffs at the rates specified in Plaintiffs' Agreements with BCBSTX.

222.    By participating in the BlueCard Program, BCBS NC, as an "Affiliate" of BCBSA and as a "Payer," was obligated to reimburse Plaintiffs at the rates set forth in the Agreements, even if BCBS NC was not a signatory to the Agreements.

223.    BCBS NC's intent to be bound by an implied-in-fact contract with Plaintiffs is also evidenced by BCBS NC's conduct. BCBS NC participated in the adjudication of these claims, communicated with Plaintiffs regarding the claims, authorized the care to be provided for some of the claims, issued partial payments, and reviewed and adjudicated appeals.

224.    BCBS NC's intent to be bound by an implied-in-fact contract with Plaintiffs is also demonstrated by the representations made by BCBS NC to their subscribers and local providers. Specifically, BCBS NC represents that the Hospitals are "in-network" with BCBS NC, meaning it has a contract with Plaintiffs. Further, BCBS NC also represents in its Provider Manual that the Home Plan is responsible for adjudicating claims for services provided to subscribers based on the subscribers' benefits and the providers' agreements with the local BCBS plans.

225.    Accordingly, there was a meeting of the minds between Plaintiffs and BCBS NC as to the binding nature of the implied-in-fact contract, as well as the material terms of the contract as they relate to both parties.

**PLAINTIFFS' ORIGINAL COMPLAINT**                                    **PAGE 62**

226.    Plaintiffs and BCBS NC understood BCBS NC to be bound to reimburse Plaintiffs according to the terms of the Agreements by reason of its participation in the BlueCard Program and by BCBS NC's own conduct and representations.

227.    In reliance on the implied-in-fact contract formed between Plaintiffs and BCBS NC by reason of their participation in the BlueCard Program, Plaintiffs provided medical services to BCBS NC's Subscribers with the expectation that BCBS NC would reimburse Plaintiffs for such services according to the terms of the Agreements.

228.    By denying claims for services provided by Plaintiffs to BCBS NC's Subscribers, BCBS NC has breached the implied-in-fact contract existing between Plaintiffs and BCBS NC.

229.    Plaintiffs have suffered damages as a direct and proximate result of BCBS NC's breach of the implied-in-fact contract; specifically, Plaintiffs are entitled to be reimbursed in an amount not less than $1,148,047.87 for the medically necessary, covered services Plaintiffs provided to BCBS NC's Subscribers.

### COUNT IV – FAILURE TO COMPLY WITH HEALTH BENEFIT PLAN IN VIOLATION OF ERISA

230.    The foregoing paragraphs are incorporated by reference.

231.    As explained above, Plaintiffs provided medically necessary covered services to the Subscribers described above, all of whom are BCBS NC's subscribers. Plaintiffs are therefore entitled to be paid the amounts due under the Agreements for that care.

232.    BCBS NC is an "Affiliate" of BCBSA and a "Payer" under the Agreements, and the Agreements apply to Plaintiffs' treatment of BCBS NC's subscribers. Upon information and belief, Plaintiffs are also entitled to payment under the terms of each Subscriber's health plan, because the Hospitals' services were medically necessary covered services that are covered by each Subscriber's health plan.

233.    Upon information and belief, some of the Subscribers whose hospital admissions are at issue are Subscriber(s) to an employer-sponsored health insurance policy that BCBS NC administers or underwrites. Thus, ERISA governs those health plans.

234.    Plaintiffs are entitled to enforce the terms of the Subscribers' health plans as the Subscribers' assignee under 29 U.S.C. § 1132(a)(1)(B). Upon admission to the Hospitals, each patient (or their legal representative) signs a COA form, which includes an assignment of the patient's health insurance benefits (including an assignment of rights to pursue those benefits) to Plaintiffs. Each of the claims at issue was submitted with a "Y" in box 53 of the claim form, indicating that the claim was submitted pursuant to an assignment of benefits.

235.    When Plaintiffs appealed each of the wrongful denial of benefits described above, they requested copies of the relevant health plan documents along with a statement of the plan's review procedures and time limits applicable to such review procedures, including any contractual limitations and any plan provisions upon which BCBS NC relied for its denial. BCBS NC did not provide the requested health plan documents, plan provisions, or otherwise advise Plaintiffs of contractual limitations or other relevant provisions from the health plan documents at any point during the claims adjudication or appeals process. BCBS NC did not inform Plaintiffs of any purported anti-assignment provisions in the Subscribers' benefit plans.

236.    As explained above, Plaintiffs provided medically necessary services to each of the Subscribers at issue. Upon information and belief, those services qualify as covered services under the Subscribers' health plans, and BCBS NC is therefore obligated to pay Plaintiffs for those services.

237.    As explained above, BCBS NC failed to pay Plaintiffs for the covered services that it provided to the Subscribers. BCBS NC's wrongful denial of benefits for the medically necessary

hospital services that Plaintiffs provided to these Subscribers breached the terms of each Subscriber's health plan, under which Plaintiffs have standing to sue through the Subscribers' assignments of benefits and rights via the COA forms that they (or their legal representative) executed upon admission to the Hospitals.

238.    As a proximate result of BCBS NC's breach of these Subscribers' health plans, Plaintiffs have been damaged in an amount in excess of the jurisdictional requirements of this Court. Plaintiffs are entitled to recover payment in an amount not less than $1,148,047.87 for the medically necessary covered services they provided to these Subscribers as set forth above.

### COUNT V – BREACH OF CONTRACT (FOR PLANS NOT SUBJECT TO ERISA)

239.    The foregoing paragraphs are incorporated by reference.

240.    Alternatively, Plaintiffs provided medically necessary covered services to each of the Subscribers at issue, and those services are, upon information and belief, covered under the terms of each Subscriber's respective health plan. To the extent that any of those health plans are not subject to ERISA, Plaintiffs are entitled to recover payment under the plan under a common law claim for breach of contract.

241.    Each health plan is a contract between the Subscriber and BCBS NC, under which BCBS NC agrees to pay for medically necessary, covered services that the Subscriber receives. Plaintiffs have standing to sue for breach of contract for BCBS NC's failure to pay for the Subscribers' hospital treatment because each Subscriber assigned their benefits and rights under the health plan to Plaintiffs by executing the COA forms.  Each of the Hospitals' claims for the services provided to the Subscribers indicated that it was being submitted pursuant to an assignment of benefits.

242.    Plaintiffs performed their obligations under the Subscribers' health plans by providing medically necessary covered services to each Subscriber.

243.    BCBS NC breached each of the Subscribers' health plans by failing to issue payment to Plaintiffs at the rates set forth in the Agreements for the medically necessary covered services that Plaintiffs provided.

244.    Plaintiffs suffered damages due to BCBS NC's breach of each Subscriber's health plan; specifically, Plaintiffs are entitled to be reimbursed in an amount not less than $1,148,047.87 under the Agreements for the medically necessary covered services that Plaintiffs provided.

### COUNT VI – PROMISSORY ESTOPPEL

245.    The foregoing paragraphs are incorporated by reference.

246.    As stated above, with respect to some of the claims at issue in this dispute, BCBS NC authorized the services rendered by Plaintiffs to the Subscribers, and BCBS NC promised to reimburse Plaintiffs in accordance with the terms of the Agreements.

247.    Plaintiffs reasonably relied upon BCBS NC's authorizations as promises to pay the rates set forth in the Agreements for the services provided to its Subscribers and continued to provide such services to the Subscribers.

248.    BCBS NC knew or reasonably should have known that Plaintiffs would rely on its promises to pay the rates set forth in the Agreements for the services that Plaintiff provided to the Subscribers because BCBS NC agreed to comply with the provisions of the Agreements by accessing their terms and negotiated rates under the BlueCard Program, including the provisions prohibiting BCBS NC from denying payment for claims it authorized.

249.    BCBS NC also agreed to comply with other provisions of the Agreements prohibiting BCBS NC from denying payment for claims for other prohibited reasons, including

requiring authorization for emergency services and denying payment for unauthorized services that were nonetheless medically necessary.

250. BCBS NC knowingly accessed the Agreements as an "Affiliate" and "Payer" by participating in the BlueCard Program, thereby promising to comply with the Agreements' terms and conditions, including their payment terms.

251. Plaintiffs reasonably relied on BCBS NC's promises to comply with the terms of the Agreements, and in reliance on BCBS NC's promises, Plaintiffs provided medical services to BCBS NC's Subscribers and submitted claims to BCBSTX for forwarding to BCBS NC for those services.

252. BCBS NC failed to reimburse Plaintiffs as required by the terms of the Agreements. Additionally, as set forth above, with respect to some Subscribers, BCBS NC denied claims based on reasons expressly prohibited by Agreements, despite promising not to do so.

253. Injustice to Plaintiffs can be avoided only if BCBS NC's promises to pay the rates set forth in and in accordance with the terms of the Agreements for the services Plaintiffs provided to the Subscribers is enforced.

254. Plaintiffs' reliance on BCBS NC's promises to pay the rates set forth in and in accordance with the terms of the Agreements for the services Plaintiffs provided to the Subscribers resulted in Plaintiffs suffering monetary damages within the jurisdictional limits of this Court. Accordingly, there is now due, owing, and unpaid from BCBS NC to Plaintiffs an amount to be proven at trial for the services provided by Plaintiffs to the Subscribers that were authorized by BCBS NC.

CONDITIONS PRECEDENT

255. All conditions precedent have been performed or have occurred.

**PLAINTIFFS' ORIGINAL COMPLAINT**                                      PAGE 67

### ATTORNEYS' FEES

256.    The foregoing paragraphs are incorporated by reference.

257.    Plaintiffs are entitled to an award of attorneys' fees under 29 U.S.C. § 1132(g) and Tex. Civ. Prac. & Rem. Code §§ 38.001.

### JURY DEMAND

258.    Plaintiffs hereby demand a trial by jury of the above-styled action for all claims for which a jury is available.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, Methodist Healthcare System Of San Antonio, Ltd., L.L.P. d/b/a Methodist Hospital Northeast, d/b/a  Methodist Hospital, and d/b/a Methodist Hospital Texsan; KPH-Consolidation, Inc. d/b/a HCA Houston Healthcare Kingwood and d/b/a HCA Houston Healthcare North Cypress; Houston - PPH, LLC d/b/a HCA Houston Healthcare Medical Center; Columbia Rio Grande Healthcare, L.P. d/b/a Rio Grande Regional Hospital; Orthopedic Hospital, Ltd. d/b/a Texas Orthopedic Hospital; North Texas - MCA, LLC d/b/a Medical City Alliance; Columbia Medical Center of Arlington Subsidiary, L.P. d/b/a Medical City Arlington; Columbia Plaza Medical Center of Fort Worth Subsidiary, L.P. d/b/a Medical City Fort Worth; Columbia Hospital at Medical City of Dallas Subsidiary, L.P. d/b/a Medical City Heart & Spine Hospitals, a Campus of Medical City Dallas; Columbia Medical Center of Plano Subsidiary, L.P. d/b/a Medical City Plano; and St. David's Healthcare Partnership, L.P., LLP d/b/a St. David's North Austin Medical Center and d/b/a St. David's Medical Center, hereby request that Defendant, Blue Cross and Blue Shield of North Carolina, be cited to appear and answer this Complaint, and that upon final trial and determination thereof, that judgment be entered in favor of Plaintiffs, awarding them the following relief:

**PLAINTIFFS' ORIGINAL COMPLAINT**                                                    **PAGE 68**

A. The amount due under the Agreements and the terms of each Subscriber's respective health plan;

B. Reasonable attorneys' fees and court costs; and

C. Such other and further relief to which Plaintiffs may be entitled.

Dated: November 17, 2025

Respectfully submitted,

POLSINELLI PC

*/s/ Adam D. Chilton*
Adam D. Chilton
TX State Bar No. 24092255
POLSINELLI PC
Old Parkland – Resolute Tower
4020 Maple Avenue, Suite 300
Dallas, Texas 75219
Telephone: (214) 661-5515
Facsimile: (214) 279-2335
adam.chilton@polsinelli.com
*Counsel for Plaintiffs*